| | | |
|---|---|---|
| FOODBUY, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER and JUDGMENT |
| | ) | |
| GREGORY PACKAGING, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

THIS MATTER is before the Court following a bench trial held before the undersigned on February 5-7, and 14, 2018. Plaintiff Foodbuy, LLC ("Foodbuy") brought two causes of action against Defendant Gregory Packaging, Inc. ("Gregory Packaging"): one for breach of contract for the alleged breach of agreement to pay amounts owed to Foodbuy, and another, in the alternative, for unjust enrichment. Part of the breach of contract claim, which alleged overcharging by Gregory Packaging to Foodbuy's Committed Customers, was dismissed for lack of subject matter jurisdiction prior to trial. (Doc. No. 55). Gregory Packaging brought nine counterclaims against Foodbuy. Two (for fraud and fraud by concealment) were dismissed at trial, but seven counterclaims remain: two counts for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment (in the alternative), tortious interference with contract, Unfair and Deceptive Trade Practices, and a Declaratory Judgment.

Pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure, the following constitutes the Court's findings of fact and conclusions of law.

## I.    FINDINGS OF FACT

## A.    The Parties

1

1.      Plaintiff and counter-defendant Foodbuy is a Group Purchasing Organization wholly owned by Compass Group, a worldwide foodservice provider.  (Doc. No. 68 at ¶ 1); (Trial Tr. 33:1 (Knight)).

2.      Defendant and Counterclaimant Gregory Packaging is a manufacturer and supplier of juice cups to institutional customers, which are sold under the "Suncup" brand.  (Doc. No. 68, ¶ 2); (Trial Tr. 203:8-17(Solado)) (referring to "Gregory Suncup").

**B.      The Foodbuy Supplier Agreement**

3.      In 2011, Foodbuy and Gregory Packaging negotiated the Foodbuy Supplier Agreement ("Agreement"). (Trial Tr. Vol. I, pp. 167-68.) Fernando Salado ("Mr. Salado") – the then Senior Sourcing Manager for Foodbuy – negotiated the Agreement with Gregory Goulet ("Mr. Goulet"), Gregory Packaging Vice President of Sales. (*Id*., pp. 168-70.) Gregory Packaging had full opportunity to review the Agreement and negotiate terms that were important to it. (Plaintiff Trial Exhibits 87-89; Trial Tr. Vol. III, pp. 510-13.) Gregory Packaging was represented by counsel to assist it with its negotiations with Foodbuy. (Trial Tr. Vol. III, p. 484.)

4.      The Agreement was signed by Gregory Packaging, by its Vice President, Daniel J. Gregory, on November 4, 2011, and by Foodbuy, by its Chairman, Tony Shearer, on December 20, 2011.  Nonetheless, the Agreement was retroactively effective as of March 1, 2011.  (Def. Ex. 1).

5.      The parties stipulate the Agreement dated March 1, 2011, is a valid and binding contract between the parties and governs the relationship between them.  (Doc No. 68, p. 2).

6.      Foodbuy drafted the Foodbuy Supplier Agreement.  (Trial Tr. 465:20-21 (D. Gregory)).  It was based on Foodbuy's template supplier agreement.  (Trial Tr. 116:22-24 (Knight)).  While Gregory Packaging requested changes to the draft agreement, Foodbuy did not accept those

changes and accepted it as a "take it or leave it" contract. (Trial Tr. 524:8-11 (D. Gregory)). The Foodbuy cover page to the Agreement, which is not part of the Agreement, notes that the "Foodbuy or Compass contract template" was used. (Def. Ex. 1).

7.     Gregory Packaging contends it entered into the Agreement to expand its sales and sell more cases of juice into new venues. (Trial Tr. 456:23-457:3 (D. Gregory)).

8.     The term of the Agreement was originally March 1, 2011, to June 30, 2013. (Def. Ex. 1).

9.     Gregory Packaging viewed the relationship as "successful" and wanted to renew it. (Plaintiff Trial Tr. Vol. III, p. 547; Pl. Trial Ex. 144.) The Agreement was amended on July 1, 2013, by the First Amendment to the Foodbuy Supplier Agreement ("Amendment"), which extended the Agreement for 2 years, until June 30, 2015. (Pl. Trial Ex. 2.) As with the Agreement, the Amendment was signed after its effective date – on November 27, 2013 by Gregory Packaging, and December 9, 2013 by Foodbuy. (Id.) In these interim periods, the parties continued to operate under the Agreement until it could be formally signed. (Trial Tr. Vol. 1, pp. 190, 215-16.) Sean Cahill ("Mr. Cahill") – the then Vice President of Sourcing for Foodbuy – thoroughly negotiated the Amendment with Vice President of Sales Gregory Goulet over the course of many months. (Id.) As with the Agreement, the Amendment was negotiated by Foodbuy and Gregory Packaging.

10.    Amendment was signed by Gregory Packaging, through Mr. Goulet, on November 27, 2013, and by Foodbuy, through its Chairman, Tony Shearer, on December 9, 2013. Nonetheless, the Amendment was retroactively effective as of July 1, 2013. (Def. Ex. 2).

11.    The Amendment contained additional terms, updated pricing, and extended the Agreement until June 30, 2015. (Def. Ex. 2).

12.    The Agreement, in Section 2 on the first page, provides:

    2. PRODUCTS. This Agreement contains the terms and conditions for the sale of products specified on Attachment "A" attached hereto (the "Products"), at the

prices specified on Attachment "A" (the "Prices") by Seller to Foodbuy Distributors (as defined in Section 3 below) purchasing on behalf of Committee Customers. The parties agree that this is a non-exclusive relationship, and there are no quantities committed by Foodbuy, the Committee Customers or the Foodbuy Distributors in either dollar value or Product items.

(Pl. Trial Ex. 1, p. 1).

13. The Agreement defines the term "Committed Customer, and states:

As used in this Agreement, the term "Committed Customer" shall mean a client of Foodbuy that has agreed in writing to authorize Foodbuy to negotiate the commercial terms of purchasing contracts on its behalf or has outsourced all or a portion of its purchasing functions to Foodbuy by written agreement.

(Pl. Trial Ex. 1, p. 1). A list of Committed Customers was attached to the Agreement and replaced with a new attachment to the Amendment.

14. The financial components of the Agreement and Amendment are the contracted product pricing and the contracted volume allowance. (Trial Tr. 33:19-24 (Knight)).

15. In general, the most negotiated parts of Agreements between Foodbuy and Suppliers are: (1) the pricing of the products; (2) the volume allowance; and (3) the types of customers that are going to be enrolled in the program. (Trial Tr. 60:24-61:5 (Knight)).

16. The Agreement permits Foodbuy to provide the benefit of improved net cost—which is made up of price and volume allowance—back to Foodbuy Committed Customers. (Trial Tr. 34:3-14 (Knight)).

17. The Agreement contains a non-solicitation provision, which provides:

18. NON-SOLICITATION. During the Term of this Agreement, absent prior written consent from Foodbuy, Seller will refrain from (i) soliciting any Foodboy Committed Customer to procure products from seller outside of the Committed Customer's relationship with Foodbuy, or (ii) otherwise arranging any procurement relationship, directly, with any Committed Customer, wherein Seller procures products for such Committed Customer.

(Pl. Trial Ex. 1, pp. 3-4).

18.     This provision is included because Foodbuy does not want "the supplier going directly to the committed customer without Foodbuy's consent and engaging them directly and excluding Foodbuy from the commercial relationship." (Trial Tr. 196:21-197:13 (Solado)); (see also Trial Tr. 43:17-22 (Knight)) (noting that the Agreement is "nonexclusive" and Foodbuy's model is "to try to drive participation through demonstrating the benefits of buying through the program . . . .").

19.     When the primary negotiator of the Agreement for Foodbuy was asked why the non-solicitation provision was included—since it is Foodbuy's position that Foodbuy is owed a volume allowance whether the product is sold through Foodbuy's program or not—he responded "I don't have a good answer for that." (Trial Tr. 202:24-203:21 (Solado)).

20.     When the primary negotiator of the Amendment for Foodbuy was asked the same question, he said "I don't know" and that he would "prefer to consult with legal" to answer the question. (Trial Tr. 240:15-21 (Cahill)).

21.     Attachment A to the contract includes a "market list price," and the Amendment includes a "Delivered into DC" price. (Def. Exs. 1, 2). That price is the price Foodbuy sends to food distributors so that distributors know the cost of a case of juice sold under the Foodbuy program. (Trial Tr. 234:5-10 (Cahill)). In other words, that price is the price to which the food distributor will deviate when the product is sold to a Foodbuy customer purchasing at Foodbuy's price. (Trial Tr. 711:15-18 (Early)).

## C.     Negotiating the Agreement and Amendment

22.     While the Agreement was based on a Foodbuy template, (Trial Tr. 116:22-24 (Knight)), the pricing was negotiated between the Parties. (Trial Tr. 174:4-9 (Solado)).

23.     Similarly, Gregory Packaging expressed concerns about entities included on the Committed Customer list and the Foodbuy Distributor list.  (Trial Tr. 174:10-19 (Solado)).

24.      However, Foodbuy's legal counsel would not permit any changes to the legal language of the document itself, only permitting changes to the attachments.  (Trial Tr. 175:5-8 (Solado)).

25.     Attachment A to the Foodbuy Supplier Agreement includes pricing.  (Def. Ex. 1).  Therein, "there's a whole mechanism in that goes through different steps that are outlined in Attachment A how that price can be changed and solicited for approval to Foodbuy."  (Trial Tr. 175:12-21 (Solado)); (Def. Ex. 1).

26.     During negotiations, Gregory Packaging expressed a "distinct need for an authorized distributor list (Attachment C) and communication of any changes."  (Def. Ex. 154); (see ¶ 21, supra).

27.     During the negotiations of the Agreement, in August of 2011, one Committed Customer, Navigator, indicated to Foodbuy that it "wants to cut a separate deal with . . . Suncup and wants to be excluded from [Foodbuy's] contract."  (Def. Ex. 217).  Gregory Packaging was invoiced for Navigator anyway, but later—in August of 2015—Foodbuy admitted Gregory Packaging had been overbilled for Navigator.  (Def. Ex. 43).

**D.     The Food Industry and Group Purchasing Organizations**

28.     Group Purchasing Organizations ("GPOs") such as Foodbuy offer special pricing to their members, which, in turn, place orders through independent food distributors.  (Trial Tr. 762:9-14 (Miller)); (Trial Tr. 117:3-10 (Knight)).

29.     In exchange for preferential pricing, GPOs—such as Foodbuy—bring new volume to suppliers—such as Gregory Packaging.  Foodbuy agrees to bring new volume to the supplier, and,

because of that new business, the supplier offers lower prices.  (Trial Tr. 35:3-24 (Knight)); (id. 35:13-16); (id. 36:7-10); (Trial Tr. 759:15-19 (Miller)).

30.     Foodbuy sends its contracts with suppliers such as Gregory Packaging to food distributors with a release notice that permits the distributor to extend Foodbuy's contract pricing to the groups of customers listed in the contract.  (Trial Tr. 394:11-19 (Surber (Sysco)).

31.     This process gives Foodbuy's customers access to Foodbuy's pricing.  (Trial Tr. 401:21-402:5 (Surber (Sysco)); (Trial Tr. 117:11-13 (Knight)).

32.     The food distributor sends data regarding all of those customers' purchases to Foodbuy, "without regard for which contracts the customer [is] eligible on."  (Trial Tr. 395:24-396:3 (Surber (Sysco)); (Trial Tr. 123:4-7 (Knight)) ("[O]nce you enroll in our program and you sign a letter of participation and you tell the distributor, we get all your data, all of your purchases, not just the ones on our contracts.").

33.     Gregory Packaging did not know that food distributors send data to Foodbuy on sales made outside the Foodbuy program—sales that Foodbuy had nothing to do with.  (Def. Ex. 23) ("[T]he report USFoods gives you should not include any cases that USFoods deductions were taken on."). There is no evidence in the record that Foodbuy ever told Gregory Packaging it received data on non-Foodbuy sales.

**E.     Pricing**

34.     Different end-user customers may buy the same products at different prices.  (Trial Tr. 401:4-7 (Surber (Sysco)); (Trial Tr. 453:9-11 (D. Gregory)).  Food distributors, however, place one order for all the product they need with a supplier on behalf of all of their customers.  (Trial Tr. 761:18-22 (Miller)).

35.     Suppliers sell their products into food distributors at a "landed cost." When the "landed cost" is higher than the Foodbuy price and a customer purchases at the Foodbuy price, the food distributor will "deviate," or "bill back." A "deviation" allows the food distributor to claim the difference between the "landed cost" and the cost at which the goods were ultimately sold to the end-user customer.  (Trial Tr. 396:4-13; 399:22-400:1 (Surber (Sysco)); (Trial Tr. 761:9-13 (Miller)); (Trial Tr. 233:5-12 (Cahill)); (Trial Tr. 453:12-454:5 (D. Gregory)) (Trial Tr. 551:14-556:9 (D. Gregory)); (Trial Tr. 711:15-25 (Early)).

36.     For example, if a food distributor buys a case of juice from a distributor for $15, and the Foodbuy contract price is $10, then when that case is sold to a Foodbuy Committed Customer paying the $10 Foodbuy price, the distributor will seek $5 back from Gregory Packaging.  (Trial Tr. 399:22-400:1 (Absaloms)).

37.     There is no deviation when the "landed cost" is lower than the Foodbuy contract price and a customer purchases at Foodbuy's price.  (Trial Tr. 407:1-11 (Surber (Sysco)); (Trial Tr. 761:14-17 (Miller)); (Trial Tr. 469:8-10 (D. Gregory)).

38.     However, any time the "landed cost" is higher than the Foodbuy contract price, and a customer purchases at Foodbuy's price, there is always a deviation.  (Trial Tr. 407:12-19 (Surber (Sysco)); (Trial Tr. 469:4-7 (D. Gregory)).

39.     Evidence showed this deviation process can be common in the food service industry.  (Trial Tr. 556:8-9 (D. Gregory)); (see also Trial Tr. 647:16-21 (DiPrima)) (noting that deviated pricing is unique to the food industry).

40.     Deviated pricing is initiated when Foodbuy provides a food distributor with a supplier contract to offer Foodbuy pricing to Foodbuy's customers.  (Trial Tr. 397:18-24 (Surber (Sysco)).

41.     Approximately ninety-nine (99) per cent of Gregory Packaging's business involves deviated pricing.  (Trial Tr. 456:14-17 (D. Gregory)).

42.     When a deviation is accompanied by a "bill back," the food distributor provides information on deviated transactions to the supplier of the product.  That information includes each product identified by its UPC code and the case quantity sold.  (Trial Tr. 396:14-19 (Surber (Sysco)).  No other information is provided, (id. 396:23-25), and no program is offered to supply more information to suppliers, (id. 397:1-8).   The food distributor's confidentiality with the customer does not permit the distributor to release any details regarding to whom the product was sold.  (Id.).  A "bill back," therefore, "would say Foodbuy contract and then total cases per line item and the bill back rate," (id.), but does not give a supplier detail about where a case of product was delivered or sold.  (Id. 407:20-23).

43.     The evidence showed that a manufacturer may sell its product to the food distributor at a "landed cost" higher than the contract price for Foodbuy, other GPOs, or other deviated programs.  Because distributors only deviate when the landed cost is higher, this ensures there is a deviation on every sales transaction.   (Trial Tr. 397:25-398:6 (Surber (Sysco)); (Trial Tr. 467:2-18 (D. Gregory)); (Trial Tr. 563:11-19 (D. Gregory)).

44.     In other words, typically, a supplier sells their entire product to a distributor at one price.  The distributor may then sell that product to a school bid customer at one price, a GPO customer at another price, a different GPO's customer at another price, and to its own customers at yet another price.  The distributor recovers the price differences for each sale by a deviation to the supplier.  (Trial Tr. 657:14-658:16 (DiPrima)) (testifying as to how transactions work in the food industry).

45.     Therefore, when a Foodbuy Committed Customer purchases a case of juice at the Foodbuy price, Gregory Packaging is ultimately paid (by the distributor) the Foodbuy Contracted Price listed in Attachment A to the Foodbuy Supplier Agreement.  (Trial Tr. 563:24-564:3 (D. Gregory)); (see also Def. Exs. 1, 2).  Such instances of purchase represent "on contract" purchases.

46.     Because distributors will not deviate up and return money to Gregory Packaging when the "landed cost" is lower than the GPO contract cost, it is important that Gregory Packaging know which distributors distribute to Foodbuy customers.  Otherwise, Gregory Packaging may sell its products into distribution at a "landed cost" too low to accommodate the Foodbuy price and would thus lose money.  (Trial Tr. 468:4-16 (D. Gregory)); (see also Def. Ex. 82).

47.     Even then, however, a supplier such as Gregory Packaging does not see what price a customer pays for its products.  (Trial Tr. 397:8-399:5 (Surber (Sysco)).

48.     Once Gregory Packaging agreed to pricing with Foodbuy, Gregory Packaging could not raise prices on Foodbuy's business.  (Trial Tr. 246:1-3 (Absaloms)).

49.     It is Foodbuy that communicates its pricing to food distributors.  (Trial Tr. 143:3-144:6 (Knight)); (Trial Tr. 233:5-15 (Cahill)); (Trial Tr. 326:17-22 (Absaloms)); (Trial Tr. 658:17-19 (DiPrima)).

50.     Distributors normally deviate to the Foodbuy price when a case of Suncup Juice is sold at the Foodbuy price.  (Trial Tr. 326:17-22 (Absaloms)); (Trial Tr. 405:20-406:1 (Surber (Sysco)) (testifying that part of the GPO contract entered into the distributor's system is the "deviated cost.").

51.     When a Foodbuy Committed Customer is purchasing through Foodbuy's GPO program, that Committed Customer pays the Foodbuy contract price, plus the distributor's markup.  (Trial

Tr. 568:21-569:3 (Early)) (Trial Tr. 406:10-13 (Surber (Sysco)); (Trial Tr. 501:19-502:3 (D. Gregory)); (Trial Tr. 555:14-556:1 (D. Gregory)); (Def. Ex. 108, p. 3).

52.    Foodbuy Committed Customers were permitted to buy "off-contract," outside of Foodbuy's program.  (Trial Tr. 776:21-24 (Miller)) ("I understand under the contract [Committed Customers] are not required to purchase through Foodbuy."); (Trial Tr. 89:25-90:3 (Knight)); (id. 104:3-6) ("I know in my world there are cases of—there are situations where people buy outside of a contract . . . ."); (Trial Tr. 118:14-119:2 (Knight)) ("We don't require [Committed Customers] to buy every item through our program.").

53.    When a Foodbuy Committed Customer makes a purchase through a channel other than Foodbuy—at a price other than the Foodbuy price—it is referred to in the industry as an "off-contract" purchase.  (Trial Tr. 653:23-654:15 (DiPrima)).

54.     When a customer purchases "off-contract," the Supplier does not owe a volume allowance for that purchase.  (Trial Tr. 654:16-25 (DiPrima)).

55.    Because a volume allowance is not owed on "off-contract" purchases, Foodbuy tries to influence the behavior of Committed Customers by showing them the benefit of the Foodbuy program.  When a Committed Customer buys through the Foodbuy program, the supplier owes a volume allowance for that purchase.  (Trial Tr. 119:3-7 (Knight)).

56.    A Foodbuy customer buying "off-contract" buys at a different price than the Foodbuy price.  (Trial Tr. 762:15-18 (Miller)).

57.    For example, a customer who negotiates its own contract with a supplier such as Gregory Packaging, and communicates that pricing to distributors, would get that negotiated price instead of the Foodbuy price.  The direct deal price would supersede the Foodbuy price.  (Trial Tr. 401:8-

13 (Surber (Sysco)). That sale, however, would still be reported to Foodbuy by the food distributor. (Id. 401:14-17).

58. When a Foodbuy customer purchases at a price other than the Foodbuy-negotiated price, that customer is purchasing on a different contract—whether that be through a deal with the distributor, a school bid, or a direct deal with Gregory Packaging. (Trial Tr. 568:21-569:3 (Early)); (see also Def. Ex. 108, p. 10). In that instance, Foodbuy has taken no action with respect to that sale. The purpose of a GPO is to drive volume, bring in new customers to increase quantities, and perform marketing. When a customer purchases through a different channel—at pricing not negotiated by Foodbuy—Foodbuy has taken none of the aforementioned actions. (Trial Tr. 654:16-25 (DiPrima)). In other words, Gregory Packaging would have that customer even without an Agreement with Foodbuy. (Trial Tr. 107:2-7 (Knight)).

59. Additionally, the food distributors themselves have marketing associates that will offer pricing to customers. That price is negotiated and is based on whatever the market will bear. (Trial Tr. 408:9-19 (Surber (Sysco)).

60. Foodbuy customers will buy at other pricing when a better price is available to them, when they have a direct bid, or when a certain distributor is out of stock for a product and they have to go to another distributor. (Trial Tr. 652:23-653:11 (DiPrima)); (Trial Tr. 118:14-119:3 (Knight)); (id. 120:4-12); (Trial Tr. 569:16-21 (Early)). On occasion, distributors would offer better pricing than the Foodbuy price. (See Def. Exs. 219, 221). Direct deals also offer better pricing than the Foodbuy price. (See Def. Ex. 222).

61. Foodbuy Committed Customers may even decide to pay a higher price than the net price they receive from Foodbuy in some instances. For example, a manager at an end-user customer may have a relationship with a distributor's account executive or may need a different delivery

time.  Furthermore, an end-user customer may place one order in which it receives larger discounts on higher-priced center-of-the-plate items, such as fish, chicken, beef, or produce, and include low-priced items with a smaller price difference, such as juice, in that order.  Or, a customer may need an order faster than they can get it through Foodbuy's program, and will pay a premium for that.  (Trial Tr. 569:24-570:15 (Early)); (Trial Tr. 653:12-22 (DiPrima)).

62.     When a distributor places an order for Gregory Packaging's Suncup Juice, Gregory Packaging does not know how many of those cases—if any—will ultimately be sold to Foodbuy customers purchasing through the Foodbuy program.  (Trial Tr. 453:1-6 (D. Gregory)); (Trial Tr. 655:17-20 (DiPrima)); (Trial Tr. 711:12-25 (Early)) ("The distributor doesn't tell [Gregory Packaging] who they're buying it on behalf of until they take a deviation and when they take that deviation, then they indicate, hey we're deviating down to this price because we sold it to this particular customer under this program.").

63.     In some instances, even the distributor does not know at the time it orders product from the supplier to what customer it will ultimately sell that product.  (Trial Tr. 656:5-7 (DiPrima)).

64.     It is not possible for a supplier to instruct a food distributor to decline to deviate to the GPO's price when a customer purchases through the GPO and to only apply the supplier's landed cost.  (Trial Tr. 411:17-21 (Surber (Sysco)).

65.     Food distributors send data on sales to entities on Foodbuy's customer list to Foodbuy, but do nothing to filter out sales made through Foodbuy's program.  (Trial Tr. 401:18-20 (Surber (Sysco)).

**F.      Volume Allowance**

66.     Two components make up the net cost of an item—volume allowance and product price.  (Trial Tr. 38:13-15 (Knight)).  A "volume allowance" is a rebate.  (Id. 38:11-12).  The volume

allowance "approximates the value" that Foodbuy is "able to negotiate based on [Foodbuy's] size and scale." (Id. 38:15-17). Gregory Packaging pays the volume allowance directly to Foodbuy, which retains some portion of it and generally passes along the rest to its customers. (Id. 38:17-20); (see also Id. 45:12-17).

67. The volume allowances owed per product are listed in Attachment A of the Agreement and Amendment, along with the product contract price. (Def. Ex. 1); (Trial Tr. 187:3-6 (Solado)). In the Amendment, there is a "net price," calculated by subtracting the volume allowance from the contract price for the product. (Def. Ex. 2); (Trial Tr. 219:14-19 (Cahill)). The purpose of the "net price" is that it tells Gregory Packaging what it is going to get for a case sold to a Committed Customer through a Foodbuy distributor—the Foodbuy contract price minus the volume allowance. (Trial Tr. 219:20-220:4 (Cahill)). If a case were sold at a price other than the Foodbuy contract price—even with the same volume allowance—the "net price" would be different than stated in the Amendment. (See Def. Ex. 2).

68. Foodbuy earns a volume allowance when its Committed Customers purchase through the Foodbuy program at the Foodbuy price. (Def. Ex. 1); (Trial Tr. 35:3-24 (Knight)); (Trial Tr. 260:24-261:4 (Absaloms)). Foodbuy's Chief Commercial Officer, and former Chief Financial Officer, testified at trial that Foodbuy's Committed Customers benefit "when they buy more on the program" because they then "pay a lower cost" and "would earn a volume allowance." (Trial Tr. 35:11-13 (Knight)). Similarly, Frederick Absaloms, the Category Manager and primary person in charge of the relationship with Gregory Packaging, testified that a volume allowance is based on "the sales for all cases that were sold through the program." (Trial Tr. 261:2-4 (Absaloms)) (emphasis added).

69. Suppliers pay a volume allowance because they get "additional case volume from [Foodbuy's] membership from participation in [Foodbuy's] program." (Trial Tr. 35:13-16 (Knight)); (Id. 36:7-10).

70. Foodbuy conceded at trial that if a sale is not made through a Foodbuy Distributor, as defined in the Agreement, or not made to a Committed Customer, also defined, then a volume allowance would not be due. (Trial Tr. 223:25-224:10 (Cahill)).

## G. Committed Customers

71. "Committed Customers" are customers of Foodbuy that have entered into an agreement— either with Foodbuy directly or with another Foodbuy Committed Customer—"to buy on the Foodbuy program." (Trial Tr. 40:8-11 (Knight)).

72. Foodbuy came up with the naming convention "Committed Customer." (Trial Tr. 352:1-5 (Absaloms)).

73. By signing up with Foodbuy, Committed Customers gain "the opportunity to buy on [Foodbuy's] programs and negotiate improved net costs that come back to them" in two ways: a deviated price and a share of the volume allowance. (Trial Tr. 40:25-41:7 (Knight)).

74. Foodbuy provides its Committed Customers an analysis every quarter that shows the value of buying "on-contract" with Foodbuy. The analysis shows the volume allowances the Committed Customer would earn and the prices the Committed Customer would receive. (Trial Tr. 42:24-43:10 (Knight)). Foodbuy provides that information to drive program participation up and "generate more income" through volume allowances. (Id.).

## H. Growth Incentive

75. A "Growth Incentive" is an agreement that a supplier will pay Foodbuy if Foodbuy grows that supplier's business by a certain amount on an annual basis. If Foodbuy achieves the growth

threshold, the supplier will pay a lump sum based on each purchase. (Trial Tr. 52:14-20 (Knight));

(Trial Tr. 225:22-227:5 (Cahill)).

76.      The purpose of the Growth Incentive is to pay Foodbuy for achieving goals in growing the

supplier's business. (Trial Tr. 52:21-23 (Knight)).

**I.      Foodbuy's Billing Practices**

77.      Foodbuy sends Gregory Packaging an invoice for volume allowances each month. (Trial

Tr. 45:15-19 (Knight)).

78.      Foodbuy invoices Gregory Packaging by receiving information from distributors regarding

sales to entities on Foodbuy's customer list and matching those sales to Foodbuy's "term sets,"

which contains the Foodbuy contract price for the product as well as the volume allowance. (Trial

Tr. 46:7-47:8 (Knight)). The purpose of the term set is to "screen out information." (Id. 48:23-

49:3).

79.      When invoicing, Foodbuy admitted at trial that "[a]ll [Foodbuy does] is create an invoice

based on the number of products times that agreed-to rebate and that's what goes on the invoice

that we bill and then we correct it." (Trial Tr. 47:5-8 (Knight)). Foodbuy simply bills for every

case they receive information about from the distributor, and then waits for manufacturers to bring

issues to them. (id. 152:11-20); (Def. Ex. 108, p. 5) ("Foodbuy appears to rely on suppliers to

raise instances of receiving invoices for customers not purchasing through Foodbuy and then

acquiesces when the supplier does not pay for those cases.").

80.      Foodbuy corrects invoices through a process they call "retro/revised invoices." (Trial Tr.

57:5-9 (Knight)); (Def. Ex. 49).

81.     A summary of retro/revised invoices presented at trial shows nine invoices to suppliers in a single month being adjusted because of "ineligibility/direct deals." (Def. Ex. 49).  In every single instance, the issue was "manufacturer disclosed."  (<u>Id</u>.).

82.     Every month, when Gregory Packaging received invoices from Foodbuy, Gregory Packaging would review the invoices and make deductions from its payment for invoice line items claiming a volume allowance for unauthorized Committed Customers, unauthorized Distributors, and incorrect amounts of volume allowance.  (Trial Tr. 627:24-628:14, 629:4-10 (Weintraub)); (<u>id</u>. 638:17-20).

83.     Gregory Packaging was sometimes billed for Cream O'Land products, a separate brand that Gregory Packaging packages for Cream O'Land under a separate co-packing contract.  That product is not listed in Attachment A as an authorized product, as it is not a Gregory Packaging product at all.  (Trial Tr. 629:23-630:8 (Weintraub)).

84.     Gregory Packaging was sometimes invoiced for distributors to which Gregory Packaging does not sell any products.  (Def. Exs. 82, 135).

85.     Some items were also invoiced by Foodbuy at the incorrect amount of volume allowance; before paying, Gregory Packaging would deduct the difference between the contract price and the price invoiced.  (Trial Tr. 630:18-631:5 (Weintraub)).

86.     Foodbuy would accept those deductions but would never send a credit or revised invoice to Gregory Packaging.  (Trial Tr. 632:5-7 (Weintraub)).

87.     On occasion, Foodbuy would continue billing for the products, customers, or distributors for which it had accepted a deduction.  (Def. Ex. 225) ("I'm just concerned on how long it took you to recommend this write-off, which meant that we continued billing at the disputed rate and the write-off had just became larger.").

88.     The invoices sent by Foodbuy contained a "sector" instead of a customer, which is the highest level (least amount) of detail that is available to Foodbuy.  (Trial Tr. 138:1-12 (Knight)).

89.     From those invoices, and by Foodbuy's admission, Gregory Packaging could not tell what customer was ultimately purchasing a case of juice.  (Trial Tr. 138:18-22 (Knight)).  The customer did not appear on the invoice backup.  (Id.); (Trial Tr. 632:20-633:5 (Weintraub)); (Def. Ex. 250); (see also Def. Ex. 108, p. 5-6).

90.     Foodbuy, however, had much more data available to it than was shared with Gregory Packing.  Foodbuy receives 29 different data elements from distributors, including the price paid for each transaction.  (Trial Tr. 138:24-139:6 (Knight)).  Indeed, Foodbuy receives from distributors "everything that the customer buys" with line-item detail regarding every data point available to the distributor.  (Trial Tr. 389:24-390:8 (Surber (Sysco)).  Such data includes:  the customer billed; the billing address, city, state, zip code; each line item sold, general descriptive information about the product; and the price the customer paid.  (Id. 389:1-13).

91.     In order to send an invoice with greater detail, Foodbuy must have approval from a Foodbuy Vice President.  (Def. Ex. 63).  The benefit of the detail is the vendor/supplier has information "to validate the sales," (id.), a benefit Gregory Packaging did not have during the course of the Agreement.

**J.      Direct Deals**

92.     Foodbuy Committed Customers sometimes buy "off-contract" when they have a separate, direct agreement with a supplier such as Gregory Packaging.  (Trial Tr. 90:4-17 (Knight)).

93.     At trial, Foodbuy admitted through its Chief Commercial Officer that when a Committed Customer purchases through a direct deal, Foodbuy is not supposed to collect a volume allowance on that sale.  (Trial Tr. 90:23-91:1 (Knight)); (id. 101:14-15); (id. 109:10-11) ("If there's a direct

deal in place then we wouldn't get a volume allowance.").  The Category Manager in charge of the relationship with Gregory Packaging testified the same.  (Trial Tr. 349:12-17 (Absaloms)) ("If there's a direct deal between a Foodbuy client a Committed Customer and Gregory, then we wouldn't subscribe them.").

94.     Foodbuy relies on being notified by a supplier that a purchase was made through a direct deal; otherwise, Foodbuy invoices the supplier for that purchase anyway.  (Trial Tr. 90:13-14 (Knight)); (id. 113:21-114:4) (testifying that there are situations where even though direct deals were excluded, Foodbuy billed the supplier for them because Foodbuy does not "always find out until a manufacturer notifies us that they've got a direct deal").

**K.     School Bids**

95.     A school bid can be a direct deal, especially where Gregory Packaging directly bids with the school system and provides them pricing.  (Trial Tr. 109:12-110:3 (Knight)); (Trial Tr. 347:22-348:4 (Absaloms)); (Trial Tr. 658:20-21 (DiPrima)).

96.     In a school bid situation, schools negotiate their own specific cost for Gregory Packaging products.  (Trial Tr. 66:19-67:5 (Knight)).

97.     Thus, school bid customers pay a different price than Foodbuy customers buying through Foodbuy's program.  (Trial Tr. 272:21-23 (Absaloms)) (testifying that one customer "being on a bid definitely would have been on a separate price").

98.     It is not normal or customary in the industry for a volume allowance to be owed on a school bid sale resulting from a direct bid.  (Trial Tr. 464:6-465:12 (D. Gregory); (Trial Tr. 658:22-24 (DiPrima)).

99.     Approximately 60% of Gregory Packaging's business is through school bids.  (Trial Tr. 463:23-464:5 (D. Gregory)).

100.    Throughout the course of the Agreement, Foodbuy was aware that Gregory Packaging had school bid business.  (Trial Tr. 67:6-19 (Knight)).

101.    Foodbuy has nothing to do with sales made through school bids.  (Trial Tr. 109:25-110:3 (Knight)).  Gregory Packaging contends it would have those sales whether it had an Agreement with Foodbuy or not.

102.    Unbeknownst to Gregory Packaging, Foodbuy was charging Gregory Packaging for a volume allowance for school bid business.  (Trial Tr. 492:3-5 (D. Gregory)).

103.    School bid business is generally sold at a lower price than the Foodbuy price because there is no volume allowance paid on school bid sales.  (Trial Tr. 464:6-465:7 (D. Gregory)).

104.    School bid business is sold at Gregory Packaging's smallest, thinnest margin.  (Trial Tr. 464:24-465:7 (D. Gregory)).  The margin is cents on a case.  (Id.).

105.    Foodbuy's volume allowance is generally more than cents on a case.  (Def. Exs. 1, 2). Volume allowances for almost all products started at $1 per case, (Def. Ex. 1), and went up from there, (Def. Ex. 2).  Thus, if a volume allowance is paid on a case sold at school bid pricing, Gregory Packaging would lose money on that sale.  (Trial Tr. 465:8-12 (D. Gregory)); Trial Tr. 561:13-17 (D. Gregory)); (Trial Tr. 658:24-659:2 (DiPrima)) ("[T]he margins are not there.  It's just too tight.  You can't – you can't do both.  You can't . . . give the absolute best price possible and give a volume allowance.").

106.    In fact, when Foodbuy performed an analysis to find bid sales in its invoices to Gregory Packaging, it compared pricing, and assumed cases sold at lower prices were bid sales.  (Trial Tr. 122:1-5 (Knight)); (Trial Tr. 274:17-275:14 (Absaloms)); (id. 373:17-374:1).

107.    Because many of these bids are run by distributors, Gregory Packaging does not always know which schools are participating in a bid program.  (Trial Tr. 713:14-23 (Early)).

108. The fact that many schools purchase through school bids, and at school bid pricing, does not mean that some schools do not purchase through Foodbuy's program at Foodbuy's price. When a school buys at Foodbuy's price, Gregory Packaging owes and paid a volume allowance on that sale. (Trial Tr. 550:9-19 (D. Gregory)).

**L.     Invoices for Volume Allowance Payments for Sales in 2015**

109. By its plain terms, the Foodbuy Supplier Agreement terminated on June 30, 2015. (Def. Exs. 1, 2) ("This Agreement shall commence as of the Effective Date and shall continue until June 30, 2015 . . . ."). Foodbuy, however, contends it is owed volume allowances for July and August of 2015. While allegations regarding July and August of 2015 were not included in the original Complaint, the Court allowed Foodbuy to amend its Complaint at trial at the close of Plaintiff's case-in-chief. (Trial Tr. 431:7-434:21).

110. Until February of 2015, Gregory Packaging reviewed and paid Foodbuy's invoices, although Gregory Packaging "from time to time" made modification to the invoices prior to payment. (Trial Tr. Vol. II, p. 263.)

111. From March 2015 through June 2015, Gregory Packaging did not pay Foodbuy invoices. (*Id*., pp. 263-67 (Absaloms)). Gregory Packaging presented no evidence of payment on these invoices under the terms of the Agreement, but instead, argues the invoices as introduced into evidence, (see id.), are inaccurate and therefore no credible evidence supports Foodbuy's calculation of damages. (Trial Tr. 369:25-370:7 (Absaloms); 638:21-640:3 (Weintraub)).

112. There was no written agreement to extend the Foodbuy Supplier Agreement. (Trial Tr. 285:5-8 (Absaloms)). The Foodbuy Supplier Agreement is explicit that except for the lists in Attachments B and C, the "Agreement may not be modified without a written amendment signed by an authorized representative of each party." (Def. Ex. 1 at ¶ 19).

113.    Furthermore, even though the parties were negotiating extension of the Agreement beyond June of 2015, Gregory Packaging did not pay invoices billed for July and August 2015.  (*Id.*, p. 267-72.)  Michael Knight, Foodbuy's Chief Commercial Officer, testified at trial after the Agreement and Amendment expired, Foodbuy "kept purchasing under the same agreement" and he would thus "expect" Gregory Packaging to "pay the rebates that go along with those sales." (Trial Tr. 76:6-14 (Knight)).  Mr. Knight also testified that he "kn[e]w" "the Foodbuy supplier agreement with Gregory Packaging ended in June of 2015."  Id.  Mr. Knight therefore acknowledged there was no agreement by Gregory Packaging to pay July and August invoices, but that he made the "assumption" that Gregory Packaging would "pay the volume allowances" associated with purchases made during that time.  (Id. 78:22-79:8).

114.    In September of 2015, once Gregory Packaging told Foodbuy it would not sign a new agreement, Foodbuy stopped billing Gregory Packaging and transitioned this business. (Trial Tr. Vol. II, p. 271-72.)

**M.    Facts Relevant to Contractual Interpretation**

115.    Foodbuy admitted at trial that direct deals are excluded from the Foodbuy Supplier Agreement and, thus, a volume allowance is not owed on those cases.  (Trial Tr. 90:23-91:1 (Knight)); (*id.* 101:14-15); (*id.* 109:10-11) ("If there's a direct deal in place then we wouldn't get a volume allowance.")); (Trial Tr. 349:12-17 (Absaloms)) ("If there's a direct deal between a Foodbuy client a Committed Customer and Gregory, then we wouldn't subscribe them.")); (see also Def. Ex. 228).  Foodbuy's Chief Commercial Officer also recognized that the Foodbuy Supplier Agreement does not explicitly by its language exclude direct deals.  (Trial Tr. 165:3-5 (Knight)).

116.     Moreover, while Foodbuy maintains that school bids were not excluded under the Foodbuy Supplier Agreement because there is no explicit language stating school bids are excluded, (Trial Tr. 67:20-22 (Knight)), Foodbuy excluded Chartwells school bids from the very beginning, at least in the North Carolina and South Carolina markets, (Trial Tr. 273:11-274:10 (Absaloms)), though only for distributors where "Gregory Packaging has indicated they have school bids," (Def. Ex. 64).

117.     Chartwells are a sector of Compass, which wholly owns Foodbuy.  (Trial Tr. 96:9-11 (Knight)).

118.     In fact, in August, at the beginning of a school year, Foodbuy would ask Gregory Packaging if it had school bids in certain school districts serviced by Chartwells.  (Def. Ex. 142).

119.     That Foodbuy excluded some school bids from the beginning of the Agreement is probative of how Foodbuy interpreted the Agreement throughout its effective period, particularly because the same witness, Mr. Absaloms, testified that Foodbuy "administered the agreement according to what was agreed between the two parties and what was signed."  (Trial Tr. 282:8-10 (Absaloms)); (id. 283:8-9) ("[W]e did administer the program the way it was agreed upon."); (id. 284:3-13); (Def. Ex. 108) ("Compass has a reputation of following its contracts to the letter.")

120.     At no time during the course of the Agreement did Foodbuy tell Gregory Packaging that it interpreted the Agreement as Foodbuy came to interpret the Agreement in this litigation—that a volume allowance is owed for all sales, whether through Foodbuy's program or not.  (Trial Tr. 459:25-460:4 (D. Gregory)).

121.     The Court finds that throughout the Agreement, the Parties appear to have reasonably interpreted the Agreement and Amendment in different ways.  The Court, however, finds that for the reasons explained below—a volume allowance was owed only on products purchased through

Foodbuy's program at Foodbuy's negotiated price—"on contract"—by a Foodbuy Distributor purchasing on behalf of a Foodbuy Committed Customer.

**Double-Dipping**

122.    "Double-dipping" is an industry term that describes a situation in which a customer is getting the benefit of two purchasing programs.  For example, double-dipping occurs when a customer purchases on a "net program," with no volume allowance such as a school bid, but draws on Foodbuy volume allowances as well.  (Trial Tr. 364:6-15 (Absaloms)); (see also Def. Ex. 24) ("[W]e were able to go line by line and confirm that Navigator and Axis were double-dipping (taking deductions from the distributor and at the same time Foodbuy was claiming them on invoicing).").

123.    "Double-dipping" is a negative term, and even Foodbuy admits it "would be detrimental to Gregory Packaging."  Trial Tr. 364:6-15 (Absaloms)); (see also Trial Tr. 659:3-8 (DiPrima)) (testifying "it's really a negative connotation" and it "means that someone is getting something twice when they should only be getting it once").

124.    A Vice President at Foodbuy, Mr. Miguel Huertas del Piño, called double-dipping a "problem," noting that the root of the problem was that "bid schools (net program)" had been subscribed to Gregory Packaging's volume allowance billing terms.  (Def. Ex. 70).

125.    Once Country Pure replaced Gregory Packaging as the primary juice supplier with Foodbuy, Mr. Absaloms emphasized internally that to avoid "take backs on 'bid' like situations" and "to avoid continual problems throughout the year" Foodbuy should take care to "avoid double dipping situations."  (Def. Ex. 55).

**Gregory Packaging's Efforts to Obtain Distributor Data**

126. Gregory Packaging first became suspicious of Foodbuy's invoices when it found that more cases were accounted for by deviations and Foodbuy invoices than were actually shipped into certain distribution centers. (Trial Tr. 461:7-13 (D. Gregory)).

127. Therefore, Gregory Packaging attempted to obtain data directly from distributors and, at first, received data from those distributors. (Trial Tr. 462:1-9 (D. Gregory)).

128. However, once this dispute was raised with Foodbuy, Gregory Packaging was unable to obtain any more data from any distributor. (Trial Tr. 463:5-22 (D. Gregory)).

129. Gregory Packaging has contracts with its distributors. (See, e.g. Def. Ex. 39). Foodbuy, of course, also has contracts with distributors. (Trial Tr. 37:7-10 (Knight)).

130. Gregory Packaging also asked Foodbuy for detailed data regarding Foodbuy's invoices, but did not receive any detail until after the expiration of the Agreement. (Trial Tr. 634:16-25 (Weintraub)). During the Agreement, Foodbuy refused to provide such detailed data. (Trial Tr. 643:20-644:8 (Weintraub)). After the Agreement ended, Foodbuy provided more-detailed invoices covering a short period of time, which contained information regarding which customer was buying Gregory Packaging products. (id. 154:9-23). Even so, the detailed invoice backup did not include any pricing or cost information. (Def. Ex. 253).

131. Therefore, Foodbuy admitted internally that "we do not have a clear delineation on bid schools and we have not been able to manage that," except for when "suppliers raise up issues or deduct on member units per invoices," but noted suppliers can only do so "if they receive unit level detail," (Def. Ex. 64), which Gregory Packaging did not. (Trial Tr. 634:16-25 (Weintraub)); (see also Trial Tr. 138:18-22 (Knight)); (Trial Tr. 632:20-633:5 (Weintraub)); (Def. Ex. 250); (see also Def. Ex. 108, p. 5-6)).

**Conduct of the Parties During the Course of the Agreement**

132.     Throughout the Agreement, the parties conducted themselves as though they interpreted the Agreement the same way—that a volume allowance was only owed on cases of Suncup Juice purchased through Foodbuy's program at Foodbuy's price.

133.     In forming her opinions, Foodbuy's expert witness testified that the most important thing to her was how the parties interacted throughout the Agreement.  (Trial Tr. 775:2-5 (Miller)).

134.     When Gregory Packaging came to find out about cases of juice sold through other programs that were either:  (i) not a listed product; (ii) not sold by a listed Foodbuy Distributor; (iii) not sold to a listed Committed Customer; or (iv) were sold through a different program, i.e. at a different price—Foodbuy would accept a deduction or issue a credit each and every time.  (Trial Tr. 459:15-24 (D. Gregory)); (Def. Ex. 6) (noting corrections to Foodbuy invoices and that "[t]his exercise is done every month"); (Def. Ex. 19) (sending back Foodbuy invoices with unauthorized customers highlighted); (Def. Ex. 133A) (correcting an invoice); (Def. Ex. 136A, 136B, 136C) (correcting invoices); (Def. Ex. 138) (Foodbuy inquiring as to why a certain distributor is not being honored and being told they are not listed as a Foodbuy Distributor); (Def. Ex. 139) (correcting invoices); (Def. Ex. 140) ("We will also review and adjust the invoices to the contracted Distributors only."); (Def. Ex. 167A) (noting corrections to invoices).

135.     When Gregory Packaging was invoiced for customers that were "double-dipping," Foodbuy agreed Gregory Packaging should not be invoiced for that customer and assured Gregory Packaging that Foodbuy would "scrub" its data going back years to ascertain and correct instances of Gregory Packaging being invoiced by Foodbuy when a Committed Customer was receiving the benefit of another program.  (Def. Ex. 24).

136.     In response, a Vice President at Foodbuy instructed his subordinates on an internal email to, "just like [Navigator] and Axis, please look at other Committed Member subscription that was

bid business and that shouldn't have been subscribed to the Gregory term-set." (Def. Ex. 227) (emphasis added).

137.    When Frederick Absaloms wrote to the person at Foodbuy in charge of the relationship with IPS, noting that 88,000 cases (92%) "seems to be on bid," he was told to "exclude Sun Cup for now" because it was too difficult to isolate the 8% of cases that were purchased through Foodbuy. (Def. Ex. 47).

138.    When Gregory Packaging refused to pay volume allowances on that same customer, IPS, because IPS was using "bid pricing," the Vice President of Category Development at Foodbuy said "[i]f after our investigation we discover Gregory Packaging is right then (i) we will need to collect back any VA that we may need to repay back from IPS/Dining alliance, (ii) we will need to exclude IPS from the Gregory term-set so we don't continue billing," (Def. Ex. 47). This evidence shows that Foodbuy contemplated that a volume allowance was not owed if IPS was purchasing through school bids.

139.    In January of 2014, a procurement analyst at Foodbuy asked Gregory Packaging's Vice President of Sales to mark on a list of products what products were eligible for the Foodbuy program and which were not eligible for the Foodbuy program. (Def. Ex. 243). The only reason for Foodbuy to have any interest in the identification of what was eligible for its program is that Foodbuy understood it was not permitted to invoice for a volume allowance on *all* purchases, but instead it could invoice only those purchased through its program.

140.    Even Foodbuy called it "overbilling" when it admitted to "overbilling" for three Committed Customers and two distributors because they had school bid business. (Def. Ex. 43). Foodbuy appeared to acknowledge then, even after the Agreement ended that billing for school bid business was "overbilling." (Def. Ex. 43) (dated Aug. 31, 2015).

141.    Additionally, Foodbuy determined which customers were purchasing through Foodbuy and which were purchasing through other programs, such as school bids, by comparing pricing. (Def. Ex. 43 at ¶1(b)). This is probative of the fact that those purchasing at other prices are buying "off-contract"; are not owed a volume allowance; and Foodbuy agreed with that during the course of the Agreement and after, until this litigation commenced.

142.    Foodbuy never stated to Gregory Packaging—at any time during the Agreement—that its interpretation was as it interprets the Agreement now—that is was entitled to a volume allowance for every case of juice sold by any entity to any entity at any price. (Trial Tr. 339:14-19 (Absaloms); (Trial Tr. 459:25-460:4 (D. Gregory)). Yet, Foodbuy had numerous opportunities to do so. (Def. Ex. 26) (pointing out unauthorized Committed Customers for which Gregory Packaging was billed and noting "[t]hey are NOT using Foodbuy contract pricing as you stated"); (Def. Ex. 46) ("What we view as the main problem is that IPS School members were using NET bid pricing through Distributors and then trying to capture rebates while not using the Foodbuy contract pricing."); (Def. Ex. 76) ("How are we [e]nsured that these customers will be using the Foodbuy Contracts?"); (Def. Ex. 134) ("They apparently do not use your contract pricing."); (Def. Ex. 147) (declining to add distributors to the authorized list because Gregory Packaging "has many bids, marketing commitments and that would cause a lack of clarity"); (Def. Ex. 155) (seeking information regarding a bid request from Chartwells in March 2013 and whether it is handled outside Foodbuy's program); (Def. Ex. 175) (seeking information regarding a bid request from Chartwells in April 2011 and whether it is handled outside of Foodbuy's program); (Def. Ex. 158) (refusing to add proprietary products to the authorized product list because "[t]hey do NOT have allowances built in"); (Def. Ex. 166) ("All of those items are either bid specific items or proprietary

for a specific customer."); (Def. Ex. 255) ("Benjamin Foods will NOT purchase at your contract price, therefore we will continue to exclude them from the program.").

143. If Foodbuy had been operating at that time under its current interpretation, Foodbuy could have told Gregory Packaging of that interpretation and would have refused to allow Gregory Packaging to deduct amounts when "off-contract" sales were found and brought to Foodbuy's attention. (Def. Ex. 108, p. 4).

144. To the contrary, when a Foodbuy employee wrote that interpretation in a draft email to Gregory Packaging—months after the expiration of the Agreement—it was removed internally before the message was sent to Gregory Packaging. (Compare Def. Ex. 42 at ¶ 3 with Def. Ex. 43); (see also Def. Ex. 229) (removing the comment); (Def. Ex. 107).

**Evidence of Overcharging by Foodbuy**

145. When Gregory Packaging entered into the Foodbuy Supplier Agreement, the company's overall volume increased by between 600,000 and 700,000 cases. After the Agreement was terminated in June of 2015, Gregory Packaging lost about the same amount of overall business— between 600,000 and 700,000 cases. (Trial Tr. 458:20-459:2 (D. Gregory)).

146. Plaintiff's rebuttal expert, qualified at trial as an expert in forensic accounting, has no experience in the food service industry. (Trial Tr. 75:22-76:2 (Miller)). She therefore relied heavily on Foodbuy and its parent, Compass, to make assumptions regarding the food industry to ultimately come to her opinions. However, in doing so, she did not consider the credibility of Compass and its affiliates, such as Plaintiff. This raises questions as to whether her assumptions are valid because she presumed everything was above board from Compass's perspective. (Feb. 14 Trial Tr. 83:11-21 (The Court)).

147.    As noted above, Foodbuy and Gregory Packaging agree on preferential product pricing, which Foodbuy offers to its members.  That preferential pricing minus the volume allowance received back from Gregory Packaging—some portion of which is usually passed on to the end-user customer—makes up the net price paid by a customer for a case of juice.  (See ¶¶ 49, 60, 61, supra).

148.    Those customers, however, may purchase "off-contract" through other programs—whether such purchase is a distributor program, a direct deal, a school bid or some other program.  When customers do so, Foodbuy has played no role in that sale and is not entitled to a volume allowance.

149.    Moreover, when a customer purchases "off-contract," they do not pay the Foodbuy-negotiated price, they pay the price offered by the distributor, negotiated in a direct deal, or offered in some other way.

150.    Therefore, in order to ascertain how many cases of juice were sold through other channels—not sold through Foodbuy's program at Foodbuy's price—one can look at pricing data and compare the contract price; that is, the price to which the distributor deviates.

151.    The pricing data provided by Foodbuy was originally provided along with analysis by Foodbuy to show that Gregory Packaging was overcharging Foodbuy's Committed Customers. This claim was dismissed by the Court.  (Doc. No. 55).  This analysis is relevant, however, because many of the distributors and Committed Customers that were previously brought to Foodbuy's attention by Gregory Packaging—for which Gregory Packaging took a deduction and Foodbuy accepted—are missing from the pricing analysis.  (Trial Tr. 570:21-571:1 (Early)).

152.    This is significant because Gregory Packaging largely deducted for customers purchasing through school bids, which would generally pay a lower price.  Those customers thus would have shown up as "undercharges" in Foodbuy's analysis, resulting in a lower net "overcharge" number.

(Trial Tr. 571:2-14 (Early)). By submitting such an analysis without including all of the undercharges within Foodbuy's knowledge that should have been included, Foodbuy thus sought inflated damages in its dismissed overcharging claim.

153. If the missing Committed Customers and Distributors are accounted for, it is clear that Gregory Packaging paid $999,750 in volume allowance for customers purchasing "off-contract." (Ex. 325, p. 7); (Trial Tr. 573:9-20; 574:17-575:4 (Early)). Only 17,076 of those cases appear in the Foodbuy pricing data—resulting in $21,123 in overpaid volume allowance that is addressed below. Additionally, Gregory Packaging short-payed $541,835 for these very customers— meaning Gregory Packaging has not been damaged by that amount. (Ex. 325, p. 7); (Trial Tr. 574:8-14 (Early)).

154. Therefore, the total volume allowance that has been overpaid by Gregory Packaging for the cases that were previously brought to Foodbuy's attention as buying "off program" and are missing is $436,792, after accounting for previous deductions taken by Gregory Packaging and cases that are included in the pricing data, which are considered below. (Ex. 325, p. 7); (Trial Tr. 574:17-575:4 (Early)).

155. The bulk of proof of overcharging, however, comes from the pricing data itself. The pricing data shows cases of Gregory Packaging's juice for which Foodbuy claimed a volume allowance, but for which the ultimate price paid for that case (the price to which the distributor deviated) was higher or lower than the Foodbuy contract price, indicating it was purchased through another program. (Def. Ex. 68); (Trial Tr. 569:7-15 (Early)).

156. There are many reasons a Foodbuy Committed Customer would purchase Gregory Packaging products through other channels, despite being a Foodbuy Committed Customer. There

are obvious reasons a Committed Customer would do so at a lower price, but there are reasons a Committed Customer would do so at a higher price as well.

157.    When a Committed Customer purchases at the Foodbuy price, the distributor will always deviate to that price; when another price is paid, the customer has purchased through another channel.

158.    Each contract year, running from July to June, there were many cases—both for Compass and non-compass Committed Customers—purchased at prices other than the Foodbuy price.  All in all, 4,489,367 cases were purchased "off-contract" for which Gregory Packaging was charged a volume allowance.  (Def. Ex. 68); (Def. Ex. 325, p. 2); (Trial Tr. 575:10-20 (Early)).

159.    Using an average volume allowance per year, which is calculated by taking the total volume allowance paid divided by the total number of cases claimed by Foodbuy—which accounts for the actual volume allowances paid, since each product has a different volume allowance associated with it and some products sell better than others—results in an overpayment by Gregory Packaging to Foodbuy of $6,042,431.00.  (Def. Ex. 68); (Def. Ex. 325, p. 2) (Trial Tr. 575:10-576:18 (Early)).

160.    The Court finds the pricing data used for that analysis to be reliable and that testimony presented by Gregory Packing witnesses on the issue to be credible.  The Foodbuy Supplier Agreement states that "All Allowances are calculated based on Foodbuy Distributor reporting and tracking of such Foodbuy Distributor dollar volume with Seller on behalf of Committed Customers and no other reporting or tracking (Seller's reporting or otherwise) shall have any bearing on the Allowances to be paid hereunder."  (Def. Ex. 1).  Foodbuy's Chief Commercial Officer testified at trial that the pricing data used in this analysis, (Def. Ex. 68), is "based on distributor data" and that he is confident it is accurate "from the distributor information we collect."  (Trial Tr. 125:15-

126:3 (Knight)).  In fact, Mr. Knight testified that the data kept by Foodbuy is the "same data" as distributor data.  (Id. 124:7-13).

161.    In addition to "off contract" purchases for which Foodbuy received a volume allowance that was not owed, distributor data from Gordon's Food Service ("Gordon's"), another major distributor, shows Foodbuy invoiced for cases that were never distributed by Gordon's at all.  In response to a subpoena, Gordon's produced "Suncup Juice case movement reports from January 1, 2008 through September 30, 2015."  (Def. Ex. 320 at ¶ 5).  The data, however, was not filtered to include only cases sold at Foodbuy's price:  "The data provided did not filter out any sales based on pricing or how the end-user customer purchased the item.  In other words, it does not filter out only purchases made through the Foodbuy program."  (Def. Ex. 320 at ¶ 6).

162.    That data, when matched up by distributor invoice number, shows that Foodbuy was paid by Gregory Packaging for 46,436 cases that were never actually distributed by Gordon's.  (Def. Ex. 325, p. 4); (Trial Tr. 606:6-608:12 (Early)); (Def. Ex. 320B-320F).  The Gordon's data spans a time larger than the Foodbuy Supplier Agreement—it goes several years earlier (January 1, 2008) to several months later (September 30, 2015).  (Def. Ex. 320 at ¶ 5).  Therefore, there is no risk of timing issues accounting for this discrepancy.  The Court thus applies an average volume allowance for these cases that were invoiced but never distributed, and finds Gregory Packaging was overcharged by Foodbuy an additional $61,759.88.  That amount does not represent "off-contract" purchases, but instead represents purchases that were never made at all, but Foodbuy invoiced Gregory Packaging for them.

163.    This overcharging by Foodbuy ultimately affects the Growth Incentive as well.  As explained above, the Growth Incentive was an incentive to Foodbuy to grow Gregory Packaging's business.  Gregory Packaging would pay an agreed-to amount per case once Foodbuy met certain

thresholds. However, when the "off-contract" cases are accounted for, Foodbuy did not reach the growth incentive thresholds:

164. From 2011 to 2012, the growth incentive threshold was 1,000,000 cases. While Foodbuy claimed to have sold 1,459,639 cases, Foodbuy only actually sold 821,343 through Foodbuy's program. Thus, Foodbuy did not meet the threshold, and the $145,963.84 paid by Gregory Packaging was not owed. (Def. Ex. 325, pp. 5-6); (Trial Tr. 610:9-20 (Early)).

165. There was no agreement to pay a growth incentive for the year from 2012 to 2013. (Def. Ex. 325 pp. 5-6);

166. From 2013 to the end of the Agreement, the yearly thresholds were the same—the first began 1,600,000 cases (20 cents per case, back to case one); the second began at 1,900,000 cases (25 cents per case, back to case one); the third began at 2,100,000 cases (30 cents per case, back to case one). (Def. Ex. 2). In the 2013-2014 year, Foodbuy claimed 1,987,440 cases, but actually only sold 617,499 under Foodbuy's program, thus Gregory Packaging paid a volume allowance of $370,935.80 that was not owed. (Def. Ex. 325, pp. 5, 6); (Trial Tr. 609:2-611:16 (Early)). In the final year of the contract, Foodbuy initially claimed 2,164,217 cases, but later revised that number and only now claims a volume allowance of $373,833.39. (Pl. Ex. 109); (but see Trial Tr. 610:15-611:2 (Early)). That revised amount is not owed by Gregory Packaging because Foodbuy did not sell enough cases to reach the threshold required. (Def. Ex. 325, pp. 5, 6); (Trial Tr. 609:2-611:16 (Early)).

167. Therefore, in total, Gregory Packaging suffered $7,057,882.52 in compensatory damages—which represents money paid by Gregory Packaging that was not owed. (Trial Tr. 611:17-612:16 (Early)); (Def. Ex. 325, p. 4).

## II. Conclusions of Law

### A.    Applicable Standards for Contractual Interpretation

"'The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract.'" Supplee v. Miller-Motte Bus. Coll., Inc., 239 N.C. App. 208, 216, 768 S.E.2d 582, 590 (2015) (quoting Branch v. High Rock Lake Realty, Inc., 565 S.E.2d 248, 252 (2002) (citation omitted)).  Here, the parties stipulated at trial that the Foodbuy Supplier Agreement is a valid and binding contract between the parties and governs the relationship between them.  Thus, the central issue for resolution by the Court on the beach of contract claims is whether either party breached the terms of the contract.

While the parties here agree to the existence of the contract, they do not agree as to the meaning of the terms within the written agreement.  The finding of a breach of the contract requires this Court's interpretation of the terms.  The applicable law is well settled:

> The principal objective in the interpretation of a contract's provisions is to ascertain the intent of the parties. Holshouser v. Shaner Hotel Grp. Props. One, 134 N.C. App. 391, 397, 518 S.E.2d 17, 23 (1999), aff'd per curiam, 351 N.C. 330, 524 S.E.2d 568 (2000). Where the language of a contract is "clear and only one reasonable interpretation exists, the courts must enforce the contract as written . . . ." Woods v. Nationwide Mut. Ins. Co., 295 N.C. 500, 506, 246 S.E.2d 773, 777 (1978). However, if a contract contains language which is ambiguous, a factual question exists, which must be resolved by the trier of fact.  Crider v. Jones Island Club, Inc., 147 N.C. App. 262, 266–67, 554 S.E.2d 863, 866 (2001).

> "The trial court's determination of whether the language of a contract is ambiguous is a question of law [and an appellate court's] review of that determination is de novo." Bicket v. McLean Securities, Inc., 124 N.C. App. 548, 553, 478 S.E.2d 518, 521 (1996), disc. rev. denied, 346 N.C. 275, 487 S.E.2d 538 (1997) (citations omitted).  An ambiguity exists where the "language of a contract is fairly and reasonably susceptible to either of the constructions asserted by the parties." Glover v. First Union National Bank, 109 N.C. App. 451, 456, 428 S.E.2d 206, 209 (1993).  Stated differently, a contract is ambiguous when the "writing leaves it uncertain as to what the agreement was . . . ." Barrett Kays & Assoc. v. Colonial Building Co., 129 N.C. App. 525, 528, 500 S.E.2d 108, 111 (1998) (quoting International Paper Co. v. Corporex Constructors, Inc., 96 N.C. App. 312, 317, 385 S.E.2d 553, 556 (1989)).  "The fact that a dispute has arisen as to the

parties' interpretation of the contract is some indication that the language of the contract is, at best, ambiguous." St. Paul Fire & Marine Ins. Co. v. Freeman–White Assoc., Inc., 322 N.C. 77, 83, 366 S.E.2d 480, 484 (1988); see also Glover, 109 N.C. App. at 456, 428 S.E.2d at 209.

Salvaggio v. New Breed Transfer Corp., 564 S.E.2d 641, 643 (N.C. App. 2002); see also Dockery v. Quality Plastic Custom Molding, Inc., 547 S.E.2d 850, 852 (N.C. App. 2001) ("A contract which is plain and unambiguous on its face will be interpreted as a matter of law by the court. If the agreement is ambiguous, however, interpretation of the contract is a matter for the jury [as fact-finder].") (citations omitted); see also Abbington SPE, LLC v. U.S. Bank, Nat'l Ass'n, No. 7:16-CV-249-D, 2016 WL 6330389, at *4 (E.D.N.C. Oct. 27, 2016), aff'd, 698 F. App'x 750 (4th Cir. 2017).

In an ambiguous contract, "the language used, the subject matter, the end in view, the purpose sought, and the situation of the parties at the time" can all aid the factfinder in determining the intentions of the parties. Cordaro v. Singleton, 229 S.E.2d 707, 709 (N.C. App. 1976); see also Century Commc'ns, Inc. v. Hous. Auth. of Wilson, 326 S.E.2d 261, 264 (N.C. 1985) (noting that where contractual "language is uncertain or ambiguous, the court may consider all the surrounding circumstances, including those existing when the document was drawn, those existing during the term of the instrument . . . , and the construction which the parties have placed on the language, so that the intention of the parties may be ascertained and given effect"). The court should review "the entire instrument" and "cannot reject what the parties inserted or insert what the parties elected to omit." Weyerhaeuser Co. v. Carolina Power & Light Co., 127 S.E.2d 539, 541 (N.C. 1962). The terms of a contract "'are to be harmoniously construed, and if possible, every word and every provision is to be given effect.'" WakeMed v. Surgical Care Affiliates, LLC, 778 S.E.2d 308, 312 (N.C. App. 2015) (quoting In re Foreclosure of a Deed of Trust, 708 S.E.2d 174, 178 (N.C. App. 2011)).

As explained below, the Court concludes the plain and unambiguous terms in the contract clearly define what sales are governed by the Agreement. In the alternative, even if the terms are ambiguous and reasonably susceptible to either of the parties' interpretations, the Court – as fact finder in the bench trial – finds that the evidence also indicates what sales are covered by the parties' Agreement. In both instances, as explained below, the result is the same to show Foodbuy breached the contract.

Finally, upon determination of a breach, the Court must determine the extent damages for breach are warranted. "The amount of damages is generally a question of fact, but whether that amount has been proven with reasonable certainty is a question of law [the appellate court will] review de novo." Plasma Centers of Am., LLC v. Talecris Plasma Res., Inc., 731 S.E.2d 837, 843 (N.C. App. 2012); see also Scheerer v. Fisher, 741 S.E.2d 926 *5 (N.C. App. 2013)

1.      The Plain Language of the Agreement

Here, the Court interprets the Foodbuy Supplier Agreement by its plain language. Brown v. Ginn, 640 S.E.2d 787, 789 (N.C. App. 2000) ("Contracts are interpreted according to the intent of the parties. The intent of the parties is determined by examining the plain language of the contract."). The Court finds the plain language of the Agreement clear.

The Agreement begins by laying out its effective date, the parties to it, and its term. The second paragraph then defines the sales to which the Agreement applies:

> 2. PRODUCTS. This Agreement contains the terms and conditions for the sale of the products specified on Attachment "A" attached hereto (the "Products"), at the prices specified on Attachment "A" (the "Prices"), by Seller to Foodbuy Distributors (as defined in Section 3 below) purchasing on behalf of Committed Customers. The Parties agree that this is a non-exclusive relationship, and there are no quantities committed by Foodbuy, the Committed Customers or the Foodbuy Distributors in either dollar value or Product items.

(Def. Ex. 1 at ¶ 2).

This language of the contract "contains the terms and conditions for the sale of the products" is plain and defines what sales are governed by the Agreement. The Agreement then lists four items necessary for the terms and conditions of the Agreement to apply. The Agreement applies to the sale of: (i) the products specified in Attachment A; (ii) at the prices specified in Attachment A; (iii) to Foodbuy Distributors; (iv) purchasing on behalf of Committed Customers. (Def. Ex. 1). Therefore, sales that do not meet any of those four criteria fall outside of the Agreement.

The plain language of this contract makes sense. The Agreement only applies to sales at Foodbuy's contract price because other sales are outside of Foodbuy's program and are sales in which Foodbuy did not participate. Gregory Packaging offered preferential pricing and a volume allowance; in return, Foodbuy agreed to bring sales volume to Gregory Packaging. Under the plain language of this Agreement, Gregory Packaging offers exactly that and Foodbuy is incentivized and rewarded for bringing new business to Gregory Packaging. Foodbuy is not entitled to a volume allowance on business Gregory Packaging would have even without its relationship with Foodbuy.

No other part of the contract contradicts that interpretation, based on the Agreement's plain language. There is language in Paragraph 19 that provides:

> Unless otherwise agreed to by both parties in writing, this Agreement shall apply to all invoices, purchase orders and other documents of purchase which Foodbuy or a Foodbuy Distributor purchasing on behalf of a Committed Customer may place with Seller, or which Seller may generate as a result of a Product request, for the Products or other items purchased from Seller on behalf of Committed Customers (each an "Order").

(Def. Ex. 1 at ¶ 19). The foregoing paragraph—nineteen paragraphs into the Agreement—is limited by Paragraph 2, which sets out from the beginning as to what the terms and conditions of the Agreement apply. Additionally, the paragraph's plain language provides that the Agreement

applies to all invoices in which "a Foodbuy Distributor purchasing on behalf of a Committed Customer may place with Seller." "Committed Customer" is a defined term within the Agreement. A distributor purchasing on behalf of its own customer, a school bid customer, or a Gregory Packaging customer cannot be purchasing *on behalf* of a Foodbuy Committed Customer. Most importantly, the purpose of Paragraph 19 is so that the parties do not have to reference the Agreement in each purchase order or invoice to which the Agreement applies. (Def. Ex. 1 at ¶ 19) ("The terms and conditions of this Agreement shall apply to any Order whether or not this Agreement or its terms and conditions are expressly referenced in the Order."). Its purpose is not to expand the scope of the Agreement itself.

The plain language of other portions of the Agreement also support this interpretation. For example, Paragraph 2—the paragraph that sets forth the sales to which the Agreement applies— also provides explicitly that the "Parties agree that this is a *non-exclusive relationship*." (Def. Ex. 1 at ¶ 2) (emphasis added). Non-exclusive means Foodbuy Committed Customers are free to purchase outside of the Foodbuy program if they wish to do so. It is, thus, clear that Parties contemplated a relationship in which Foodbuy's Committed Customers could purchase outside the Agreement.

Furthermore, the Agreement contains a non-solicitation provision. (Def. Ex. 1 at ¶ 18). In that provision, Gregory Packaging agreed to not solicit Foodbuy's Committed Customers "to procure products from Seller outside of the Committed Customer's relationship with Foodbuy" and to not "otherwise arrange[ ] any procurement relationship, directly, with any Committed Customer, wherein Seller procures products for such Committed Customer." (Id.). There would be no reason for a nonsolicitation provision if Foodbuy was entitled to a volume allowance on every purchase, whether the purchase was made through Foodbuy or not, and Foodbuy's witnesses

could not come up with any such reason.  To conclude otherwise would result in reading this provision to a nullity.  As explained below, the Court cannot read the contract terms to a nullity. See Int'l Eng'g & Trading Corp. v. Ingersoll-Rand Co., No. 3:12CV294-DSC, 2012 WL 5354998, at *5 (W.D.N.C. Oct. 30, 2012) (explaining "It is well settled that a contract is construed as a whole. The intention of the parties is gleaned from the entire instrument and not from detached portions. Individual clauses are to be considered in context. All parts of the contract will be given effect if possible. This Court has long acknowledged that an interpretation which gives a reasonable meaning to all provisions of a contract will be preferred to one which leaves a portion of the writing useless or superfluous." (citing Emmanuel African Methodist Episcopal Church v. Reynolds Const. Co., Inc., 718 S.E.2d 201, 203 (N.C. App. 2011) (citations omitted)); see Dignity Viatical Settlement Partners v. Cedalion Sys., Inc., 4 F. Supp. 2d 466, 470 (W.D.N.C. 1998) (citing Woods v. Nationwide Mut. Ins. Co., 246 S.E.2d 773, 777 (N.C. 1978) (contracts terms are to be harmoniously construed, and if possible, every word and every provision is to be given effect)).

Lastly, Attachment A to the Agreement – which is specifically referenced in the Agreement – contains a list of prices to be paid by distributors for Gregory Packaging's products when those products are purchased on behalf of Committed Customers.  In the same pricing chart, the volume allowance Gregory Packaging agreed to pay is set forth on per case—showing that pricing and volume allowance go hand-in-hand.  (Def. Ex. 1, Att. A).  The Amendment, (Def. Ex. 2), goes one step further, including not only the price per case and the volume allowance, but additionally calculating the "net price per case," which is the product price minus the volume allowance.  (Def. Ex. 2); (Trial Tr. 219:14-19 (Cahill)).  The Amendment makes it abundantly clear that product pricing and the volume allowance go hand-in-hand under the terms of the Agreement.

These other provisions are important because the Court must look at the Agreement as a whole and gather its meaning from the entire contract and not from only particular words, phrases, or clauses. Divine v. Watauga Hosp., 137 F. Supp. 628, 631 (M.D.N.C. 1956). In other words, "the entire agreement is to be considered to determine the meaning of each part." Id.; see also Starling v. Still, 485 S.E.2d 74, 76 (N.C. Ct. App. 1997).

Looking at the Agreement as a whole, the meaning of the Agreement is clear from its plain language. Foodbuy earns a volume allowance when its Committed Customers purchase certain products at certain prices through certain distributors—all of which are delineated in the Agreement. "Off-contract" purchases, therefore, are exactly that—outside the contract.

## 2. The Intent of the Parties

### a. The Rule Against Surplusage

While the Court need not go beyond the Agreement's plain language to interpret its meaning, to the extent the contract terms are ambiguous, the Court notes that other rules of contractual interpretation support the Court's interpretation above.

An interpretation that reduces an essential term of the Agreement to surplusage is not favored in the law. Instead, "[c]ontract terms must be construed to give meaning and effect to every part of the contract, rather than leave a portion of the contract meaningless or reduced to mere surplusage." Goodman v. Resolution Tr. Corp., 7 F.3d 1123, 1127 (4th Cir. 1993); see also Island Creek Coal Co. v. Lake Shore, Inc., 832 F.2d 274, 277 (4th Cir. 1987) ("It is a universal rule of contract law that, in construing language in a contract, an interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions of the contract meaningless."); Steel Ltd. Partnership v. Caldor, Inc., 850 F.2d 690 (4th Cir. 1988) (table decision) (noting that demoting a clause to "mere surplusage" "violate[s] a basic rule of contract

construction" and "an interpretation that gives meaning to the entire agreement is favored over one that makes some part of it mere surplusage").

Were the Court to agree with Foodbuy's interpretation that it was entitled to a volume allowance on *every* case sold by Gregory Packaging, whether or not it was sold to a customer buying through Foodbuy's program at Foodbuy's price, such interpretation would reduce all of the pricing in the Agreement to mere surplusage. (Def. Ex. 1, Att. A); (Def. Ex. 2). Additionally, it would reduce the nonsolicitation provision to surplusage, as all of Foodbuy's witnesses have made clear there is no reason for that language under Foodbuy's interpretation of the Agreement.

On the contrary, the Court's interpretation requires and gives meaning to each of those provisions, as well as the remainder of the Agreement. The rule against surplusage thus supports the Court's interpretation.

The Court is particularly concerned about reducing the pricing components to mere surplusage because under North Carolina law, pricing is an essential term. Apple Tree Ridge Neighborhood Ass'n v. Grandfather Mountain Heights Property Owners Corp., Inc., 697 S.E.2d 468, 472 (N.C. Ct. App. 2010) ("Essential terms of a contract include the parties, the subject matter of the agreement, and the price to be paid under it."); see also Stillwagon v. Innsbrook Golf & Marina, LLC, No. 2:13-CV-18, 2014 WL 5871188, *3 (E.D.N.C. Nov. 12, 2014) ("Price is an essential term."). Therefore, applying the rule against surplusage, and thus giving the entire Agreement meaning, supports the Court's interpretation of the Agreement.

### b.    Economic Sense

"When contractual interpretation makes no economic sense, that's . . . [a] compelling reason for rejecting it." In re Convenience USA, No. 01-8178C-11, 2003 WL 21459559, *5 (Bankr. M.D.N.C. June 17, 2003) (citing Dispatch Automation, Inc. v. Richards, 280 F.3d 1116,

1119 (7th Cir. 2002)). In the <u>In re Convenience</u> case, the bankruptcy court summarized the applicable North Carolina law, noting, "North Carolina courts subscribe to the general rule of contract construction that 'when a contract is fairly susceptible of two constructions, one of which makes it fair and customary and which prudent persons would naturally enter into while the other makes it inequitable, the former interpretation must be preferred to the latter.'" <u>In re Convenience USA, Inc.</u>, 2003 WL 21459559, at *5 (quoting <u>Management Systems Associates, Inc. v. McDonnell Douglas Corporation</u>, 762 F.2d 1161, 1172 (4th Cir. 1985), (citing <u>Bank of North Carolina v. Rock Island Bank</u>, 570 F.2d 202, 207 (7th Cir. 1978) (applying North Carolina law)); <u>see also</u> <u>DeBruhl v. State Highway & Public Works Com.</u>, 95 S.E.2d 553, 557 (N.C. 1956); <u>Burwell v. Griffin</u>, 312 S.E. 917, 921 (N.C. Ct. App. 1984).

Several leading treatises on the law of contracts echo this rule. <u>In re Convenience USA, Inc.</u>, 2003 WL 21459559, at *6. For example, one treatise notes "the well-settled rule that in construing the terms of an agreement, the fact that informed and experienced persons do not customarily bind themselves to unjust and unreasonable obligations must be considered by the court." <u>Id</u>. (quoting 11 Samuel Williston & Walter Jaeger, A TREATISE ON THE LAW OF CONTRACTS § 32:11 (4th ed.)). Another provides that "an interpretation which gives a reasonable, lawful and effective meaning to all terms is preferred to an interpretation which leaves a part unreasonable, unlawful or of no effect." <u>Id</u>. (quoting RESTATEMENT SECOND OF CONTRACTS § 203(a) (1981)).

Here, the Court's interpretation makes economic sense. A volume allowance is owed by Gregory Packaging when it sells a product to Foodbuy's Committed Customers, who buy at Foodbuy's negotiated price. That price has the volume allowance built into it, which is passed

back to Foodbuy (and, in part, its customer), resulting in a fair net price. (Trial Tr. 657:4-13 (DiPrima); (see also Trial Tr. 537:6-8 (D. Gregory)).

The alternate interpretation put forth by Foodbuy makes no economic sense, and no reasonable supplier would enter into such an agreement. Gregory Packaging sells to school bid customers at its lowest margins—mere cents per case. It cannot be said that it would make economic sense to pay a volume allowance on school bid cases. The volume allowance owed to Foodbuy was, at its lowest point, $1.00 per case for most products (Def. Ex. 1), and went much higher than that, (Def. Ex. 2). Thus, under Foodbuy's interpretation, Gregory Packaging would *lose* money on school bid cases, which makes no economic sense because approximately 60% of Gregory Packaging's business is through school bids. No reasonable supplier would agree to a deal where it loses money on 60% of its business. Instead, Gregory Packaging's interpretation – and the Court's – results in a fair and customary arrangement. See Mgmt. Sys. Associates, Inc., 762 F.2d at 1172 (citations omitted).

### c.      Usual and Customary Practice in the Industry

The evidence showed both Foodbuy and Gregory Packaging approached the negotiation and decision to enter into the Foodbuy Supplier Agreement as actors intimately familiar with the usual and standard practices of the foodservice industry. It is with that background that they negotiated and agreed to the Agreement.

"[A] court may look to known customs or usages in a particular industry to determine the meaning of a contract." M&G Polymers USA, LLC v. Tackett, 135 S. Ct. 926, 935 (2015). Indeed, in North Carolina, "[a] custom or usage may be proved in explanation and qualification of terms of a contract which otherwise would be ambiguous." Bank of America, N.A., v. Old Republic Ins.

Co., 4 F. Supp. 3d 790, 796 (W.D.N.C. 2014) (citing E.L. Scott Roofing Co. v. State, 82 N.C. App. 216, 223, 346 S.E.2d 515, 520 (1986)).

Here, the evidence shows the custom and practice of the industry is that a volume allowance is not owed for cases of product sold outside of a GPO's (Foodbuy's) program. Indeed, that is why "off-contract" is an industry term. A witness from the industry testified that no one in the industry would expect a volume allowance to be owed on a case sold outside of a GPO's program, even if that customer is purchasing other products through the GPO. Moreover, Gregory Packaging works with other GPOs, and has never participated in a deal in which a GPO is entitled to a volume allowance for sales outside of its program.

This usual and customary practice in the industry supports the Court's interpretation—both parties knew when they negotiated the Agreement that GPOs in the industry only collect a volume allowance on cases of juice sold through the GPOs program and at the GPOs price, which has a volume allowance built in. This usual and customary practice—known to industry participants—supports the Court's interpretation.

### d.     The Drafter of the Agreement

The United States Court of Appeals for the Fourth Circuit recently recognized that "we construe ambiguous provisions in contracts against the drafters." Bartels by and through Bartels v. Saber Healthcare Group, LLC, 880 F.3d 668, 685 (4th Cir. 2018) (Floyd, J., concurring in part and concurring in judgment); Maersk Line, Ltd. v. United States, 513 F.3d 418, 423 (4th Cir. 2008) ("The basic contract law principle contra proferentem counsels that we construe any ambiguities in the contract against its draftsman."). Indeed, the Court has a "duty under North Carolina law to construe the ambiguous contract terms against the drafter," to the extent there are any ambiguous terms. Cosey v. Prudential Ins. Co. of America, 735 F.3d 161, 170 (4th Cir. 2013); see also

Benezra v. Zacks Inv. Research, Inc., No. 1:11-CV-596, 2012 WL 1067559 (M.D.N.C. March 30, 2012) ("[U]nder North Carolina law, any ambiguity in a contract must be resolved against the drafter.") (internal citations omitted); Novacare Orthotics & Prosthetics E., Inc. v. Speelman, 528 S.E.2d 918, 921 (N.C. Ct. App. 2000) ("[W]hen an ambiguity is present in a written instrument, the court is to construe the ambiguity against the drafter—the party responsible for choosing the questionable language.").

Here, even if there were an ambiguity, it should be construed against Foodbuy, as drafter of the Agreement. The Foodbuy Supplier Agreement was drafted by Foodbuy and based on Foodbuy's template. Any changes to the actual language of the agreement (not the information in its attachments, such as pricing) suggested by Gregory Packaging were rejected. Therefore, while the Court finds the contract unambiguous, even if it were to apply this principle of contractual interpretation, it finds the Agreement was drafted by Foodbuy and should be construed against it. This supports the Court's interpretation of the Contract.

### e.    Conduct of the Parties During the Course of the Agreement

Most corroborative of the Court's interpretation of the Agreement above is the conduct of the Parties prior to the time this dispute arose and when both were acting under the Agreement as they interpreted it. Under North Carolina law, the Court "must give consideration to evidence of the parties' own interpretation of the contract prior to the controversy." Bicket v. McLean Sec., Inc., 532 S.E.2d 183, 188 (N.C. Ct. App. 2000) (quoting Investment Trust v. Belk–Tyler, 289 S.E.2d 145, 148 (N.C. Ct. App. 1982) (internal citation omitted)).

The U.S. Court of Appeals for the Fourth Circuit has held the same, specifically holding that the parties conduct during the course of a contract is subject to "great, if not controlling, influence." Assoc. v. McDonnell Douglas, 762 F.2d 1161, 1171 (4th Cir. 1985) ("The practical

interpretation of a contract by the parties for any considerable period of time before it comes to the subject of controversy, is deemed to be of great, if not controlling, influence.").

The Court finds the following actions by the parties support the Court's interpretation of the Agreement:

• Foodbuy considered the financial components of the Agreement and Amendment to be the product pricing and the contracted volume allowance—price was the key.

• The point of the Agreement, from Foodbuy's perspective, was to provide the benefit of an improved net cost—made up of price and volume allowance—back to Committed Customers.

• During negotiations of the original Agreement, one Committed Customer, Navigator, indicated it wanted to "cut a separate deal" with Gregory Packaging and be excluded from the Foodbuy contract.

• Foodbuy's Chief Commercial Officer testified that Suppliers pay a volume allowance because they get additional volume from Foodbuy's membership.

• Foodbuy's Chief Commercial Officer testified that Committed Customers, as defined in the Agreement, are customers of Foodbuy that enter into an agreement "to buy on the Foodbuy program." By signing up with Foodbuy, Committed Customers gain the opportunity to buy on Foodbuy's programs and negotiate improved net costs that come back to them in two ways— a deviated price and a volume allowance.

• Foodbuy encourages its Committed Customers to buy "on-contract" by sending analyses to Committed Customers showing the advantages of the Foodbuy program.

• Although Foodbuy admits that direct deals are excluded and Foodbuy does not earn a volume allowance on Gregory Packaging's direct deals, Foodbuy also admits the contract does not explicitly exclude direct deals. This shows that purchases outside of the Foodbuy program do not

have to be explicitly excluded because all Parties understood they are not included pursuant to the dictates of paragraph 2 of the Agreement.

• While Foodbuy maintains it is entitled to a volume allowance for purchases made by schools through school bids—and not through Foodbuy—it excluded some school bids from the beginning, namely some from Chartwells, its affiliate. This shows that Foodbuy understood from the beginning that bid purchases should have been excluded; otherwise, Foodbuy would not have given up a volume allowance on any school bid purchases, and particularly not for the Compass entities or sectors.

• At some points during the relationship, Foodbuy would ask Gregory Packaging if it had school bids in certain districts.

• In one instance, Mr. Absaloms asked Gregory Packaging if a cross-dock would earn a volume allowance because "they would do it at the contracted price," showing that during the Agreement, Foodbuy recognized that it was only entitled to a volume allowance for sales made at its contracted price.

• In another example, Mr. Absaloms noted internally to Foodbuy that a deduction in volume allowance payments from Gregory Packaging for one distributor, Benjamin Foods, was "valid" because Benjamin Foods was not implementing Foodbuy's Pricing. When Mr. Absaloms attempted to collect a volume allowance on Benjamin Foods notwithstanding Gergory Packaging's valid deductions, he did not say he could do so under the Agreement, but instead told Gregory Packaging that Benjamin Foods was using Foodbuy pricing, and thus indicating Foodbuy's interpretation that only cases sold at Foodbuy's price earned a volume allowance.

- A Vice President at Foodbuy called "double-dipping" a "problem" and noted the source of the problem was that schools purchasing under school bids had been subscribed (incorrectly) to Gregory Packaging's volume allowance billing terms.

- Mr. Absaloms sought to avoid double-dipping situations once Gregory Packaging's competitor took over as the Foodbuy preferred supplier.

- Foodbuy employees noted that bid business should not have been subscribed to the Gregory term-set.

- Foodbuy called it "overbilling" when it admitted it had invoiced Gregory Packaging for volume allowances for three Committed Customers and two distributors selling through bid pricing and not Foodbuy pricing.

- Most importantly, when Gregory Packaging found out about instances of double-dipping or instances where Gregory Packaging was being invoiced for a volume allowance for cases that were not sold through Foodbuy's program, Foodbuy would accept a deduction and not require that Gregory Packaging pay those volume allowances.  This is particularly probative of how Foodbuy interpreted the Agreement because while taking these actions, Foodbuy claims it "administered the Agreement according to what was agreed between the parties and what was signed."  If Foodbuy had been operating at the time under its current interpretation of the Agreement, it would have refused to allow Gregory Packaging to deduct those amounts.

- Lastly, Foodbuy never shared its current interpretation of the Agreement—that it permits Foodbuy to collect a volume allowance on everything—to Gregory Packaging throughout the four years of the Agreement, despite numerous opportunities to do so.

**B.      Gregory Packaging's Counterclaims**

With the Court's interpretation of the Foodbuy Supplier Agreement in mind, the Court first turns to Gregory Packaging's counterclaims, and then to consideration of Foodbuy's claims.

1.    **Count One:  Breach of Contract**

The first counterclaim for Breach of Contract does not relate to the major dispute, but instead relates to Paragraph 5 of the Agreement, which obligates Foodbuy to assist Gregory Packaging in disputes with Foodbuy Distributors.  (Def. Ex. 1 at ¶ 5).  Foodbuy distributors are independent distributors but have contracts with Foodbuy.  The relevant portion of the Agreement provides:

> 5. Payment.  Payment for products supplied by Seller to Foodbuy Distributors purchasing on behalf of Committed Customers shall be subject to a separate contract between the Seller and the Foodbuy Distributor.  **In the event of a dispute between Seller and a Foodbuy Distributor with respect to the Product supplied to a Foodbuy Distributor pursuant to this Agreement, Foodbuy will use commercially reasonable efforts to assist in resolving the dispute.**

(Def. Ex. 1 at ¶ 5) (emphasis added).

Under the plain terms of the contract, Foodbuy was required to use "commercially reasonable efforts" to assist Gregory Packaging in its disputes with Foodbuy Distributors. "Commercially reasonable efforts" is a phrase used often in the law.  See, e.g., Meridian Investments, Inc. v. Federal Home Loan Mortgage Corp., 855 F.3d 573 (4th Cir. 2017); NNN Durham Office Portfolio 1, LLC v. Grubb & Ellis Co., No. 12-CVS-3945, 2016 NCBC 93A, 2016 WL 7489690 (N.C. Super. Dec. 29, 2016).  "In determining "commercial reasonableness," courts should not engage in a selective process identifying whether any specific activity should or should not have been used."  Lexington Furniture Indus., Inc. v. Bob Timberlake Collection, Inc., No. 08 CVS 02407, 2009 WL 2901618, at *7 (N.C. Super.Ct.  Feb. 9, 2009) (citing Avesair, Inc. v. InPhonic, Inc., 2007 NCBC 32 ¶ 36 (N.C.Super.Ct. Oct. 16, 2007)).

Here, Gregory Packaging argues Foodbuy breached Paragraph 5 of the Agreement by not assisting Gregory Packaging when Gregory Packaging sought case tracking information from distributors. Gregory Packaging did not present a preponderance of the evidence to show that Foodbuy failed to use "reasonable commercial measures" to resolve disputes arising under the Agreement or of any dispute between Gregory Packaging and a Foodbuy Distributor. The evidence shows that Foodbuy engaged in pre-litigation mediation, as well as numerous discussions with Gregory Packaging in order to try to resolve the dispute prior to filing its claim. This claim is without merit. Furthermore, even if Gregory Packaging had presented sufficient evidence on this claim, Gregory Packaging failed to present sufficient evidence of damages caused by any breach of this provision by Foodbuy.

### 2. Count Two: Breach of Contract and Count Four: Unjust Enrichment

The second counterclaim is also for Breach of Contract, but this count is at the heart of this dispute and alleges a breach of contract based on Foodbuy overcharging Gregory Packaging. Under the Court's interpretation of the Agreement explained above, Foodbuy agreed to invoice Gregory Packaging—and Gregory Packaging agreed to pay—a volume allowance for cases of juice sold through Foodbuy's program. Foodbuy breached the Agreement by invoicing Gregory Packaging for far more cases than that—cases that were off contract that Foodbuy never sold.

Over-invoicing is a breach of the Agreement. As explained above, the Agreement's plain language makes clear that only cases: (i) of certain products; (ii) sold at Foodbuy's contract price; (iii) to Foodbuy distributors; (iv) buying on behalf of Foodbuy Committed Customers, are eligible for a volume allowance. This is not only how the industry works, it makes sense—Foodbuy earns a volume allowance on those cases it played a role in selling and that were sold at its negotiated price, which has a volume allowance built into it. That is the only transaction that would make

economic sense, and it is the only deal to which Gregory Packaging agreed. Foodbuy breached

that Agreement, and Gregory Packaging is entitled to recover damages on this claim.

Based on the exhibits and testimony at trial that support the findings of fact above, the

Court concludes Gregory Packaging is entitled to recover $7,057,882.52 in compensatory

damages. (See Def. Exhibit 325; Trial Tr. 611-612 (Early)).

In light of this ruling on Gregory Packaging's breach of contract claim, the Court concludes

Gregory Packaging is not entitled to judgment on count four, which was its alternative claim for

unjust enrichment. Benchmark Elecs., Inc. v. Cree, Inc., No. 1:16-CV-529, 2018 WL 472819, at

*13 (M.D.N.C. Jan. 18, 2018) ("A contract implied in law cannot be asserted where there is an

express agreement between the parties, unless there is a clear indication the parties abandoned the

contract and no longer intended to be bound by it.") (citing Triad Packaging, Inc. v. SupplyOne,

Inc., 925 F. Supp. 2d 774, 787–89 (W.D.N.C. 2013), aff'd, 597 Fed.Appx. 734 (4th Cir. 2015);

Geoscience Grp., Inc. v. Waters Const. Co., 759 S.E.2d 696, 702 (N.C. Ct. App. 2014)).

### 3. Count Three: Breach of the Implied Covenant of Good Faith and Fair Dealing

In every contract there is an implied covenant of good faith and fair dealing that neither

party will do anything which injures the right of the other to receive the benefits of the agreement."

Williams v. Craft Dev., LLC, 682 S.E.2d 719, 723 (N.C. Ct. App. 2009) (internal quotation marks

and citation omitted). Where the claim for breach of good faith is "part and parcel" of a similar

claim for breach of an express term of the contract claim, that claim will rise and fall with the other

breach of contract claim. Shalford v. Shelley's Jewelry, Inc., 127 F.Supp.2d 779, 787 (W.D.N.C.

2000) (quoting Murray v. Nationwide Mut. Ins. Co ., 472 S.E.2d 358, 368 (N.C. Ct. App. 1996)).

Because the covenant of good faith and fair dealing is an implied term, it cannot be used to

contradict the express terms of a contract. Rich Food Servs., Inc. v. Rich Plan Corp., 98 F. App'x

206, 211 (4th Cir. 2004) (unpublished) (citing <u>Campbell v. Blount</u>, 24 N.C. App. 368, 371, 210 S.E.2d 513, 515 (1975)). This understanding conforms to the central purpose of the implied duty of good faith, which is to allow enforcement of a vague or incomplete agreement that the ratifying parties intended to be binding, but that lacks certain terms essential to proper contract formation. See <u>Ultra Innovations, Inc. v. Food Lion, Inc.</u>, 130 N.C. App. 315, 317, 502 S.E.2d 685, 687 (1998). In these cases, the duty of good faith provides the missing terms of the agreement that necessarily flow from the parties' intentions, thus allowing enforcement of the contract. <u>Id</u>.

Although some courts in North Carolina have considered good faith and fair dealing claims separate from breach of contract claims, <u>see, e.g., Eli Research, Inc. v. United Commc'ns Grp., LLC</u>, 312 F.Supp.2d 748, 761 (M.D.N.C. 2004), the weight of North Carolina authority holds that a claim for breach of the covenant of good faith and fair dealing based on facts identical to those supporting a breach of contract claim should not be pursued separately. <u>See, e.g.</u>, <u>Shelley's Jewelry</u>, 127 F.Supp.2d at 787; <u>Mech. Indus. v. O'Brien/Atkins Assocs., P.A.</u>, No. 1:97CV99, 1998 U.S. Dist. LEXIS 5389, at *11 (M.D.N.C. Feb. 4, 1998) (noting that North Carolina recognizes a separate cause of action for breach of good faith and fair dealing only in limited circumstances involving special relationships between the parties, such as cases involving funeral services and insurance contracts).

Here, Gregory Packaging's evidence of breach of the duty of good faith and fair dealing involves substantially the same conduct indicating breach of the express contract terms. At trial, Gregory Packaging did not present a preponderance of the evidence to establish that Foodbuy acted in bad faith or maliciously invoiced Gregory Packaging for any cases that it knew it was not entitled to invoice, instructed distributors to hide evidence from Gregory Packaging, or other conduct outside the evidence establishing the breach of the Agreement. Accordingly, this claim

must "rise and fall with the underlying claims for breach of contract." BioSignia, Inc. v. Life Line Screening of Am., Ltd., No. 1:12CV1129, 2014 WL 2968139, at *5 (M.D.N.C. July 1, 2014) (dismissing cause of action for breach of the covenant of good faith and fair dealing as duplicative of its breach of contract claim). Accordingly, Gregory Packaging is not entitled to judgment on this claim.

**4. Counts Five and Eight: Tortious Interference with Contact and Unfair and Deceptive Trade Practices**

Gregory Packaging failed to prove any of its remaining counterclaims by a preponderance of the evidence.[1] As an initial matter, the economic loss rule bars recovery on Gregory Packaging's causes of action for tortious interference with contract and unfair and deceptive trade practices. North Carolina's economic loss rule provides that "[o]rdinarily, a breach of contract does not give rise to a tort action by the promisee against the promisor." Legacy Data Access, Inc. v. Cadrillion, LLC, 889 F.3d 158, 164 (4th Cir. 2018) (quoting N.C. State Ports Auth. v. Lloyd A. Fry Roofing Co., 294 N.C. 73, 240 S.E.2d 345, 350 (1978)). The Fourth Circuit recently explained the economic loss rule and its application in North Carolina:

> A "tort action must be grounded on a violation of a duty imposed by operation of law," not a violation of a duty arising purely from "the contractual relationship of the parties." Rountree v. Chowan Cty., 796 S.E.2d 827, 831 (N.C. Ct. App. 2017) (citation and internal quotation marks omitted). Thus, a "tort action does not lie against a party to a contract who simply fails to properly perform the terms of the contract." Id. at 830 (citation omitted). "It is the law of contract," not tort law, "which defines the obligations and remedies of the parties in such a situation." Id. (citation omitted). Accordingly, "North Carolina law requires" courts "to limit plaintiffs' tort claims to only those claims which are 'identifiable' and distinct from the primary breach of contract claim." Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 346 (4th Cir. 1998) (quoting Newton v. Standard Fire Ins. Co., 291 N.C. 105, 229 S.E.2d 297, 301 (1976) ).

---

[1] The Court notes it ruled during trial that Gregory Packaging was not entitled to judgment on its counterclaims for Fraud and Fraud by Concealment, which were counts six and seven. Therefore, those claims need not be addressed herein.

The economic loss rule reflects "the fundamental difference between tort and contract claims." <u>Id</u>. Contract law is designed to place an injured party in the position he would have occupied had the parties adhered to their contract. Tort law, by contrast, incorporates "principles of punishment" by allowing recovery of punitive damages. <u>Strum v. Exxon Co.</u>, 15 F.3d 327, 330 (4th Cir. 1994). In preventing parties from asserting tort claims for a simple breach of contract, the economic loss rule thus "encourages contracting parties to allocate risks for economic loss themselves." <u>Lord v. Customized Consulting Specialty, Inc.</u>, 182 N.C. App. 635, 643 S.E.2d 28, 30 (2007) (opinion by Wynn, J.); see also <u>Moore v. Coachmen Indus., Inc.</u>, 129 N.C. App. 389, 499 S.E.2d 772, 780 (1998) ("To give a party a remedy in tort ... would permit the party to ignore and avoid the rights and remedies granted or imposed by the parties' contract.").

<u>Legacy Data Access, Inc. v. Cadrillion</u>, LLC, 889 F.3d at 164. In <u>Legacy Data Access</u>, the Fourth Circuit rejected, as it had before, attempts by parties "'to manufacture a tort dispute out of what is, at bottom, a simple breach of contract claim' as 'inconsistent both with North Carolina law and sound commercial practice.'" <u>Id</u>. (quoting <u>Broussard v. Meineke Disc. Muffler Shops, Inc.</u>, 155 F.3d 331, 346 (4th Cir. 1998) (citing <u>Strum v. Exxon Company</u>, 15 F.3d 327, 329 (4th Cir. 1994))).

Because Gregory Packaging does not identify or allege independent duty owed by Foodbuy to Gregory Packaging outside of the scope of the contract, the economic loss rule precludes Gregory Packaging's tort claims. <u>Strum v. Exxon Co., USA</u>, 15 F.3d 327, 331 (4th Civ. 1994) (applying North Carolina law and citing <u>Newton v. Standard Fire Ins. Co.</u>, 291 N.C. 105, 111-112, 229 S.E.2d 297, 301 (1976); <u>Asheville Contracting Co. v. City of Wilson</u>, 62 N.C. App. 329, 342, 303 S.E.2d 365, 373 (1983)). "To pursue a tort claim and a breach of contract claim concerning the same conduct, a plaintiff must allege a duty owed him by the defendant separate and distinct from any duty owed under a contract." <u>Kelly v. Georgia-Pacific, LLC</u>, 671 F. Supp. 2d 785, 791 (E.D.N.C. 2009) (quotation omitted). In <u>Paine v. Webber Jackson & Curtis, Inc.</u>, which the <u>Kelly</u> case cites, the North Carolina Court of Appeals held that "an omission to perform a contractual obligation is never a tort unless such omission is also the omission of a legal duty." 299 S.E.2d 292, 295-96 (N.C. Ct. App. 1983). Gregory Packaging seeks recovery for exactly what North

Carolina law prohibits – economic loss in tort – and all of the tort claims are improper as a matter of law for this reason.

Gregory Packaging contends that the economic loss rule is not applicable to its tort counterclaims. However, Gregory Packaging has failed to prove that an independent tort arose beyond its breach of contract counterclaims. Gregory Packaging further failed to provide any competent evidence at trial of any aggravating circumstances. For instance, with regard to its tortious interference counterclaim, Gregory Packaging failed to present evidence that any distributor cancelled any contract or changed its relationship with Gregory Packaging in any detrimental way as a result of Foodbuy's actions, or that damages resulted from Foodbuy's actions. See ACS Partners, LLC v. Americon Grp., Inc., No. 3:09CV464-RJC-DSC, 2010 WL 883663, at *8 (W.D.N.C. Mar. 5, 2010). Likewise, the Court dismissed Gregory Packaging's fraud and fraud by concealment counterclaims due to Gregory Packaging's failure to meet its burden of proof; thereby, removing Gregory Packaging's "substantial aggravating circumstances" argument. (Trial Tr. Vol. IV, p. 737.) See Legacy Data Access, Inc., LLC, 889 F.3d at 166 ("[A] plaintiff may not circumvent the economic loss rule simply by claiming that a breach of contract claim also sounds in fraud. Rather, North Carolina courts have long held that 'mere unfulfilled promises cannot be made the basis of an action for fraud.'" (quoting Williams v. Williams, 220 N.C. 806, 18 S.E.2d 364, 366 (1942); accord Brandis v. Lightmotive Fatman, Inc., 115 N.C. App. 59, 443 S.E.2d 887, 891 (1994)).

In short, "the "crux of this matter is and always has been a contract dispute," and under the facts here, Foodbuy only breached a contractual duty owed to Gregory Packaging. Legacy Data Access, Inc., LLC, 889 F.3d at 164 (citation omitted). Thus, the economic loss rule still guides and bars each of Gregory Packaging's tort counterclaims.

However, even if the economic loss rule did not operate to bar Defendant's counterclaims, each of the counterclaims fails under the facts found by the Court above based on the evidence presented at trial. Gregory Packaging failed to prove sufficient aggravating circumstances to entitle it to recover the extraordinary remedies found in North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1. A case out of the North Carolina Superior Court for Rowan County, Business Court, by the Honorable Adam Conrad is instructive on the well-settled applicable law as explained by state and federal courts.

[E]xtraordinary damages are foreign to contract law. "North Carolina follows the general rule that punitive or exemplary damages are not allowed for breach of contract." Newton v. Standard Fire Ins. Co., 291 N.C. 105, 111, 229 S.E.2d 297, 301 (1976). This is a sound and venerable rule, one that promotes certainty in commercial contract negotiations. Businesses and individuals are free to focus on the value to be gained by commercial cooperation, rather than the pitfalls posed by legal wild cards. See E.I. DuPont de Nemours & Co. v. Pressman, 679 A.2d 436, 446 (Del. 1996) ("Parties would be more reluctant to join in contractual relationships, or would expend more effort explicitly defining such relationships, if they faced the prospect of damages which could be out of proportion to the amounts involved in the contract.").

[]Because section 75–1.1 and contract law serve different purposes and rest on divergent remedial principles, section 75–1.1 "piggyback" claims are disfavored by North Carolina and federal courts alike. . . .[collecting cases]. Courts strive to keep section 75–1.1 (along with its promise of extraordinary damages) within its proper legal bounds. A section 75–1.1 claim may not be based on the "existence of an agreement, the terms contained in the agreement, and the interpretation of an agreement." [Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 347 (4th Cir. 1998)]. Thus, "a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under N.C.G.S. § 75–1.1." Branch Banking & Trust Co. v. Thompson, 107 N.C. App. 53, 62, 418 S.E.2d 694, 700 (1992). There must exist "some type of egregious or aggravating circumstances" to invoke section 75–1.1.

A classic example of an aggravating circumstance is deception "in the formation of the contract." Bartolomeo v. S.B. Thomas, Inc., 889 F.2d 530, 535 (4th Cir. 1989). A defendant's conduct may be actionably deceptive if it induced the plaintiff to enter a contract "when it did not intend to keep the promises made." . . . . Likewise, "evidence of deliberate misrepresentations made by defendant during the formation of the contract" could be a sufficiently aggravating circumstance. . . .

[]It is far more difficult to allege and prove egregious circumstances after the formation of the contract. One reason for this is that disputes concerning the circumstances of the breach are often bound up with one party's exercise of perceived rights and remedies under the contract. Even where the exercise of contractual rights is "allegedly contrary to the terms of the agreement," the legal question concerns the interpretation and application of the agreement—that is, whether the contract has been breached. Taylor v. United States, 89 F.Supp.3d 766, 773 (E.D.N.C. 2014); see also PCS Phosphate Co. v. Norfolk S. Corp., 559 F.3d 212, 224 (4th Cir. 2009); Dew Elec., Inc. v. Mass Elec. Constr. Co., 3:09cv361–RJC–DCK, 2010 WL 883671, at *3-4, 2010 U.S. Dist. LEXIS 19904, at *11–12 (W.D.N.C. Mar. 5, 2010). These claims are "best resolved by simply determining whether the parties properly fulfilled their contractual duties." Heron Bay Acquisition, 781 S.E.2d at 893 (quoting Mitchell, 148 N.C. App. at 75, 557 S.E.2d at 623–24).

[] Thus, the North Carolina Court of Appeals has repeatedly stressed that a section 75–1.1 violation "is unlikely to occur during the course of contractual performance." . . . . [collecting cases]. A party's "threats to terminate," "efforts to encourage" another to continue contractual performance while "planning to breach," and "refusal to otherwise meet" contractual obligations do not rise to the level of aggravating circumstances. Deltacom, 2011 WL 2036676, at *4, 2011 U.S. Dist. LEXIS 54488, at *12–13; see also Bartolomeo, 889 F.2d at 534–36; Kerry Bodenhamer Farms, 2017 WL 1148793, at *7-9, 2017 NCBC LEXIS 27, at *19–24; Wellness Group, LLC v. King Bio, Inc., No. 1:12-cv-00281-MR-DLH, 2014 WL 1632930, at *6, 2014 U.S. Dist. LEXIS 57239, at *16 (W.D.N.C. Apr. 24, 2014).

Post v. Avita Drugs, LLC, No. 17 CVS 798, 2017 WL 4582151, at *4–5 (N.C. Super. Oct. 11, 2017) (multiple citations omitted).  In Post, the court concluded, "Only where the circumstances of the breach exhibit clear deception are they sufficiently egregious to impose section 75–1.1 liability."  Id. at *5.  Gregory Packaging failed to prove this at trial.  See also LRP Hotels of Carolina, LLC v. Westfield Ins. Co., No. 4:13-CV-94-D, 2014 WL 5581049, at *3 (E.D.N.C. Oct. 31, 2014) ("[C]ourts must guard against permitting a litigant to transform a breach of contract claim into a UDTPA claim . . . . Mere breach of contract is not sufficient to sustain a UDTPA claim unless the breach is surrounded by substantial aggravating circumstances. . . . Moreover, a fundamental disagreement between the parties about a contract's terms and coverage is not a

"substantial aggravating circumstance[ ].".") (citing <u>Birtha v. Stonemor, N.C. LLC</u>, 727 S.E.2d 1, 10 (N.C. Ct. App. 2012) (noting that even an intentional breach of contract "is not sufficiently unfair or deceptive" to sustain a UDTPA action); <u>PCS Phosphate Co. v. Norfolk S. Corp.</u>, 559 F.3d 212, 224 (4th Cir. 2009); <u>Broussard v. Meineke Disc. Muffler Shops. Inc.</u>, 155 F.3d 331, 346–47 (4th Cir.1998); <u>Griffith v. Glen Wood Co.</u>, 646 S.E.2d 550, 558 (N.C. Ct. App. 2007)).

For similar reasons, Gregory Packaging failed to present sufficient evidence to prove tortious interference with contract. <u>See also</u> <u>Performance Sales & Mktg., LLC v. Lowe's Companies, Inc.</u>, No. 5:07CV140, 2010 WL 2294323, at *10 (W.D.N.C. June 4, 2010) (noting that in order to prove tortious interference with contract, a party must show: 1) a valid contract between the party and a third person; (2) the opposing party knows of the contract; (3) the opposing party *intentionally induces* the third person not to perform the contract; (4) and in doing so acts *without justification*; (5) resulting in actual damage to the party asserting the claim) (citing <u>Embree Constr. Group, Inc. v. Rafcor, Inc</u>., 411 S.E.2d 916, 924 (N.C. 1992)). Gregory Packaging failed to prove these claims by a preponderance of the evidence.

## C.     Foodbuy's Breach of Contract Claim and Alternative Claim for Unjust Enrichment

Having ruled on Gregory Packaging's claims, the Court turns to Foodbuy's claims for breach of contract. The Court notes that Gregory Packaging contends that Foodbuy is not entitled to recover anything under the Agreement because Foodbuy breached first, thereby excusing Gregory Packaging from performance. Gregory Packaging's reliance on case law is misplaced, and the Court is not convinced the evidence shows Gregory Packaging was no longer under any obligation to perform, and thus no obligation to pay outstanding invoices to Foodbuy.

For the reasons stated above, the Court rejected Foodbuy's interpretation of the contract and therefore concludes Foodbuy is not entitled to full judgment on its breach of contact claim for

its alleged failure to pay allowances, growth incentives, or overcharging. The Court's interpretation of the Agreement and the evidence at trial does not support such allegations.

Under the terms of the Agreement as interpreted herein, however, the Court finds Foodbuy is entitled to judgment, in part, on any unpaid invoices for the months of March 2015 through June 2015 when the written contract expired. These amounts owing for these unpaid invoices, however, should be modified to reflect the Court's interpretation of the contract provisions, and any recovery permitted herein shall be limited accordingly. In so ruling, the Court declines to enter the declaratory judgment requested by Gregory Packaging.

The Court also concludes that Foodbuy is not entitled to recover any damages allegedly incurred during July 2015 and August 2015. Based on the findings of fact above pursuant to the evidence submitted at trial, the Agreement clearly expired in June 2015. Although the parties engaged in discussions aimed at reaching another agreement, neither a meeting of the minds nor the execution of a written contract occurred. Absent either of these two things, Foodbuy is not entitled to recover under its breach of contract or unjust enrichment theories. WRH Mortg., Inc. v. S.A.S. Assocs., 214 F.3d 528, 534 (4th Cir. 2000) ("Where a contract governs the relationship of the parties, the equitable remedy of restitution grounded in quasi-contract or unjust enrichment does not lie.") (citing Acorn Structures, Inc. v. Swantz, 846 F.2d 923, 926 (4th Cir.1988)). Accordingly, Gregory Packaging is entitled to judgment on the claims related to the July and August 2015 invoices.

## D.     Damages Owed to Gregory Packaging

As noted above, Gregory Packaging suffered $7,057,882.52 in compensatory damages. Gregory Packaging has moved for prejudgment interest on this award. State law governs prejudgment interest awards in diversity cases. Liberty Mut. Fire Ins. Co. v. JT Walker Indus.,

_Inc._, 554 F. App'x 176, 192 (4th Cir. 2014). The legal rate of interest in North Carolina is 8% per annum. N.C. Gen. Stat. § 24-1. For breach of contract, the amount awarded bears interest from the date of breach. N.C. Gen. Stat. § 24-5(a); _Canady v. Crestar Mortgage Corp._, 109 F.3d 969, 975 (4th Cir. 1997) ("Under North Carolina law, interest runs from the date of the defendant's breach, not the date of the plaintiff's demand for a refund."). Accordingly, the Court awards prejudgment interest on the base compensatory damages award[2] at the North Carolina statutory rate of 8% per annum. The Court thus calculates $2,207,299.86 in prejudgment interest:

| Year | Damages from Overcharging | Growth Incentive Damages | Total Damages | Interest Rate | Interest | Years from judgment | Total interest |
|------|---------------------------|--------------------------|---------------|---------------|----------|---------------------|----------------|
| 2011-2012 | 919,930.56 | 145,963.84 | 1,065,894.40 | 0.08 | 85,271.55 | 6 | $ 511,629.31 |
| 2012-2013 | 1,083,215.57 | | 1,083,215.57 | 0.08 | 86,657.25 | 5 | $ 433,286.23 |
| 2013-2014 | 2,178,206.19 | 370935.8 | 2,549,141.99 | 0.08 | 203,931.36 | 4 | $ 815,725.44 |
| 2014-2015 | 1,861,078.68 | | 1,861,078.68 | 0.08 | 148,886.29 | 3 | $ 446,658.88 |
| | | | | | | **TOTAL INTEREST** | $2,207,299.86 |

## III.    CONCLUSION

After trial in this matter, the Court therefore ORDERS, JUDGES, and DECREES:

1.    Foodbuy breached the Foodbuy Supplier Agreement with Gregory Packaging.

2.    Foodbuy owes $7,057,882.52 in compensatory damages in addition to prejudgment interest at 8% in the total amount of $2,207,299.86; and post-judgment interest calculated from the date of this Order.

---

[2] The figures represented herein mirror the proposed award for judgment interest as calculated by Gregory Packaging in its proposed findings of fact and conclusions of law submitted to the Court post-trial. The Court notes the prejudgment interest here is calculated using only that portion of the compensatory damages referred to as "Foodbuy Pricing Data" and "Unearned Growth Incentives" as those damages appear on Defendant's Exhibit 325.

3.      Gregory Packaging breached the Foodbuy Supplier Agreement with Foodbuy by failing to pay certain invoices identified.  Foodbuy is entitled to recover on any unpaid invoices from March 2015 through June 2015 subject to and as modified by this Court's interpretation of the Agreement as provided herein.

4.      For the reasons stated on the record in open court, the parties' motions in limine (Doc. No. 57, 59, 61, 62, 74) are GRANTED IN PART and DENIED IN PART pursuant to the oral rulings issued as part of the trial proceedings.

SO ORDERED.


Signed: September 25, 2018


Frank D. Whitney
Chief United States District Judge