UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:16-cv-00809-FDW-DCK

| FOODBUY, LLC, | ) |
|---|---|
| Plaintiff, | ) |
| vs. | ) |
| | ) ORDER |
| GREGORY PACKAGING, INC., | ) |
| Defendant. | ) |

THIS MATTER is before the Court on remand from the United States Court of Appeals for the Fourth Circuit, (Doc. No. 108), on Defendant Gregory Packaging, Inc.'s ("GPI") counterclaim under the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA") against Plaintiff Foodbuy, LLC ("Foodbuy"). Following remand, the Court ordered additional briefing, (Doc. Nos. 115-17), and heard from both parties during oral argument on October 5, 2021, (Doc. No. 119). For the reasons that follow, GPI's request for relief under the UDTPA is GRANTED.

## I. BACKGROUND

Following a bench trial, the Court issued findings of fact and conclusions of law on the parties' claims and counterclaims. (Doc. No. 85 ("Trial Order")). Pursuant to the Trial Order, the Court entered judgment in favor of GPI on the breach of contract claim, awarding $7,057,882.52 in compensatory damages and $2,207,299.86 in prejudgment interest. The Court also entered judgment in favor of Foodbuy on GPI's cross-claim that Foodbuy violated North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA"). Both parties appealed.

1

The Fourth Circuit affirmed this Court's ruling in favor of GPI's breach of contract claim and vacated and remanded the Court's decision denying GPI's UDTPA cross-claim. See Foodbuy, LLC v. Gregory Packaging, Inc., 987 F.3d 102 (4th Cir. 2021). In ordering remand on the UDTPA claim, the Court of Appeals noted that it reviewed "only [this Court's] legal determination" of that claim. Id. at 121. Notably, neither Foodbuy nor GPI appealed this Court's factual findings. Id. At 121 ("GPI seeks review only of the district court's legal determination."). The Court therefore adopts and incorporates by reference all factual findings set forth in the Trial Order.

The Court finds the following summary of facts from the Fourth Circuit's decision to be helpful in framing the issue on remand.

> GPI manufactures juice cups, which it supplies to institutions like schools and hospitals. Foodbuy is a Group Purchasing Organization ("GPO"), which pools institutional purchasers so that their aggregated buying power can be used as leverage to negotiate favorable pricing with manufacturers. From 2011 through 2015, GPI and Foodbuy were engaged in a non-exclusive commercial relationship, which was memorialized in a supplier agreement (the "Agreement").
>
> . . . .
>
> . . . [In a GPO sale], the customer pays the distributor directly, but does so at the GPO-negotiated price rather than a price negotiated directly with the manufacturer. When supplying the customer, the distributor deviates to that price. The GPO then invoices GPI for a "volume allowance" rebate for each case of juice sold. The GPO passes along some—but not all—of that allowance to the customer. As a result, the customer's net price is the GPO-negotiated price minus the portion of the volume allowance that GPO passes along to it.
>
> Because all three scenarios involve an intermediary distributor, the pricing system is fairly complex. While different customers buy the same products at different prices, distributors place only one order with a manufacturer for their supply. Typically, manufacturers sell all of their products to a distributor at one up-front price, known as the "landed cost." The distributor may then sell those products to traditional sale customers at one price, direct-deal customers at another, and GPO customers at yet another.
>
> . . . .

[Under the Agreement], GPI agreed to pay Foodbuy a volume allowance based on the quantity of its products purchased "through the Foodbuy program at the Foodbuy price" by Committed Customers through Foodbuy Distributors. GPI also contracted to pay Foodbuy various "growth incentives" based on incremental increases in GPI's products purchased by Committed Customers through Foodbuy Distributors. Under the Agreement, Foodbuy invoiced GPI for the allowance due each month based on data it received from Foodbuy Distributors.

. . . .

GPI continued to monitor and review Foodbuy's monthly invoices and regularly submitted minor adjustments for things like the amount of allowance due and whether a distributor or customer was a Foodbuy Distributor or a Committed Customer under the Agreement. As the district court found, whenever GPI learned about cases of juice sold through other programs that were either: (i) not a listed product; (ii) not sold by a listed Foodbuy Distributor; (iii) not sold to a listed Committed Customer; or (iv) were sold through a different program, i.e. at a different price—Foodbuy would accept a deduction or issue a credit each and every time.

And when GPI was invoiced for customers that [were getting the benefit of two purchasing programs], Foodbuy agreed GPI should not be invoiced for that customer and assured GPI that Foodbuy would "scrub" its data going back years to ascertain and correct instances of GPI being invoiced by Foodbuy when a Committed Customer was receiving the benefit of another program.

That is because, if a volume allowance was paid on a case sold at school bid pricing, GPI would lose money on that sale.

In April 2014, Foodbuy added a new Committed Customer, IPS, which was a preexisting direct-deal customer of GPI. Soon thereafter, upon reviewing one of its monthly invoices, GPI contacted Foodbuy noting that 88,000 cases (92%) of the cases sold to IPS were "school bid" volume that should have been excluded from the Agreement. In response, Foodbuy agreed not to invoice for IPS's purchases in their entirety "because it was too difficult to isolate the 8% of cases that were purchased through Foodbuy."

Unfortunately, the Parties' relationship soured in early 2015. Despite the representations and concessions outlined above, GPI discovered that throughout the duration of the Agreement, Foodbuy had been charging it a volume allowance for every case of juice its Committed Customers purchased, not just for those cases bought through the Foodbuy program. GPI was previously unaware of this data because Foodbuy's monthly invoices did not disclose which customer purchased the juice or the applicable purchase price. Indeed, GPI did not become suspicious

3

of Foodbuy's invoices until it found that more cases were accounted for by deviations than were actually shipped into certain distribution centers.

At that point, GPI tried to obtain the relevant data directly from distributors. Once Foodbuy learned about the dispute, however, it prevented GPI from doing so. In response, GPI asked Foodbuy for detailed data regarding its invoices, but it did not receive a detailed response until after the Agreement expired. Once GPI eventually saw this pricing data, it discovered cases of GPI's juice for which Foodbuy claimed a volume allowance, but for which the ultimate price paid (i.e., the price to which the distributor deviated) was higher or lower than the Foodbuy contract price, indicating that it was purchased through another program. In total, GPI learned that it was charged a volume allowance for 4,489,367 cases it believes were purchased "off-contract," resulting in a claimed overpayment by GPI of $6,042,431.[1]

Foodbuy, 987 F.3d at 107–11 (cleaned up).

## II. STANDARD OF REVIEW

The sole issue before the Court is whether GPI is entitled to recover on its claim that Foodbuy violated the UDTPA. In vacating and remanding the judgment on that issue, the Fourth Circuit held that this Court's prior order misapplied applicable law and instructed this Court to "consider GPI's UDTPA claim in the first instance through a fresh lens in conformity with the holdings of [the Fourth Circuit's] opinion." Id. at 122. Accordingly, the Court does not simply rely on its previous ruling. Instead, the Court has taken a fresh view of the evidence and previous factual findings, considered supplemental briefing and argument from both sides on the UDTPA issue, and revisited applicable North Carolina law governing this claim. Furthermore, the parties agree that the basis for the breach of contract claim—overcharging—is insufficient on its own to establish a UDTPA claim, even if Foodbuy's breach was intentional. SciGrip, Inc. v. Osae, 838

---

[1] GPI also alleged Foodbuy counted these off-contract purchases in determining the total volume of sales to Committed Customers through Foodbuy Distributors under the Agreement. In other words, Foodbuy claimed it had hit various growth-incentive targets under the Agreement by counting cases not purchased through its program and in which it played no role in facilitating the sale. GPI maintains this artificial inflation resulted in it paying an additional $516,899.70 to Foodbuy in unearned payouts.

4

S.E.2d 334, 348 (N.C. 2020) (adopting holding that "an intentional breach of contract, standing alone, simply does not suffice to support the assertion of an unfair and deceptive trade practices claim." (citing Mitchell v. Linville, 557 S.E.2d 620, 623 (N.C. Ct. App. 2001)).

In remanding this case, the Fourth Circuit reiterated the applicable law governing reconsideration of this claim:

> Under the UDTPA, commercial entities can pursue treble damages against parties who commit unfair and deceptive trade practices or unfair methods of competition. To succeed on such a claim, the plaintiff must show that the defendant committed: "(1) an unfair or deceptive act or practice, or an unfair method of competition; (2) in or affecting commerce; (3) which proximately caused actual injury to the plaintiff or to his business." McLamb v. T.P. Inc., 619 S.E.2d 577, 582 (N.C. Ct. App. 2005). "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." Walker v. Fleetwood Homes of N.C., Inc., 653 S.E.2d 393, 399 (N.C. 2007). A practice is deceptive if it has a "tendency or capacity to deceive." RD & J Props. v. Lauralea-Dilton Enters., LLC, 600 S.E.2d 492, 501 (N.C. Ct. App. 2004). Though a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under the UDTPA, North Carolina courts have consistently held that a party may demonstrate and prove such a claim in conjunction with a breach of contract claim if it can show substantially aggravating and egregious circumstances attending the breach. See, e.g., Post v. Avita Drugs, LLC, No. 17-CVS-798, 2017 WL 4582151, at *4 (N.C. Super. Oct. 11, 2017). Examples of such aggravating and egregious behavior include: (1) lying and concealing a breach combined with acts to deter further investigation; and (2) intentional deception for the purpose of continuing to receive the benefits of an agreement.

Foodbuy, 987 F.3d at 121 (cleaned up). The Fourth Circuit also added, "Furthermore, what constitutes an unfair and deceptive trade practice is a matter of law and requires less burdensome elements of proof than fraud" because UDTPA claims "require neither intent of the actor nor actual reliance of the victim." Id. at 122 (quotation omitted).

5

And, after the parties' briefed this issue, the Fourth Circuit reiterated the applicable standard when a party seeks treble damages under the UDTPA while also pursuing a breach of contract claim, explaining:

> [C]ourts have trebled contract damages when a UDTPA claim arises from a breach of contract plus aggravating factors. See Colonial Trading, LLC v. Bassett Furniture Indus., Inc., 530 F. App'x 218, 227 (4th Cir. 2013). Put another way, when the "same course of conduct" supports both breach of contract and a UDTPA violation, a plaintiff has a right to treble damages. See Garlock v. Henson, 435 S.E.2d 114, 116 (N.C. Ct. App. 1993). This remedy prevents defendants from "divid[ing] the breach of contract action and the conduct which aggravated the breach when in substance there is but one continuous transaction amounting to unfair and deceptive trade practices." Johnson v. Colonial Life & Accident Ins. Co., 618 S.E.2d 867, 872 (N.C. Ct. App. 2005), disc. rev. denied, 360 N.C. 290, 627 S.E.2d 620 (2006).

DENC, LLC v. Philadelphia Indem. Ins. Co., 32 F.4th 38, 52 (4th Cir. 2022) (holding that an insurance company's letter denying insurance coverage was deceptive under applicable law and could therefore constitute both a breach of contract *and* a substantial aggravating circumstance—deception—accompanying the breach of contract).

### III. ANALYSIS

Applying this law to the facts in this case, the Court concludes that the facts as found by this Court in the Trial Order collectively demonstrate "substantially aggravating and egregious circumstances" to sufficiently prove a UDTPA violation. Foodbuy's substantial aggravating and egregious conduct includes: 1) concealing the breach and deterring investigation into the breach;[2]

---

[2] Foodbuy, 987 F.3d at 122; Maxwell Foods, LLC v. Smithfield Foods, Inc., No. 20 CVS 1430, 2021 WL 3811610, at *10 (N.C. Super. Aug. 26, 2021) (Conrad, J.) (explaining that egregious conduct justifying § 75-1.1 liability "might include, for example, 'the concealment of a breach combined with acts to deter further investigation'" (quoting Post v. Avita Drugs, LLC, No. 17 CVS 798, 2017 WL 4582151, at *5 (N.C. Super. Oct. 11, 2017)); Sparrow Sys. v. Private Diagnostic Clinic, PLLC, No. 14-CVS-1025, 2014 NCBC 69, 2014 WL 7592501 (N.C. Super. Dec. 24, 2014).

2) deception for the purpose of continuing to receive the benefits of the Agreement;[3] and 3) systemically overcharging more than the Agreement allows.[4]

The uncontested findings of fact support this conclusion, including but not limited to the following:[5]

> 70. Foodbuy conceded at trial that if a sale is not made through a Foodbuy Distributor, as defined in the Agreement, or not made to a Committed Customer, also defined, then a volume allowance would not be due.
>
> 79. When invoicing, Foodbuy admitted at trial that "all Foodbuy does is create an invoice based on the number of products times that agreed-to rebate and that's what goes on the invoice that we bill and then we correct it." Foodbuy simply bills for every case they receive information about from the distributor, and then waits for manufacturers to bring issues to them.
>
> 81. A summary of retro/revised invoices presented at trial shows nine invoices to suppliers in a single month being adjusted because of "ineligibility/direct deals." In every single instance, the issue was "manufacturer disclosed."
>
> 83. Gregory Packaging was sometimes billed for Cream O'Land products, a separate brand that Gregory Packaging packages for Cream O'Land under a separate co-packing contract. That product is not listed in Attachment A as an authorized product, as it is not a Gregory Packaging product at all.
>
> 84. Gregory Packaging was sometimes invoiced for distributors to which Gregory Packaging does not sell any products.

---

[3] Foodbuy, 987 F.3d at 122; see also Glob. Hookah Distributors, Inc. v. Avior, Inc., 401 F. Supp. 3d 653, 663 (W.D.N.C. 2019) (dismissing UDTPA claim because of failure to allege that the defendant, after breaching the contract, "continued to deceptively represent that it still abided by the terms").

[4] The North Carolina Court of Appeals has routinely endorsed a finding that systematic overcharging can constitute an unfair practice within the purview of the UDTPA. See White v. Allstate Ins. Co., 857 S.E.2d 368, 368 (N.C. Ct. App. 2021) ("Our Court has held that 'systematically overcharging a customer' can itself constitute an unfair and deceptive act or practice.") (quoting Sampson-Bladen Oil Co. v. Walters, 356 S.E.2d 805, 808-09 (N.C. Ct. App. 1987)). Additionally, other federal courts in North Carolina have held the same. Sullivan v. Lab'y Corp. of Am. Holdings, No. 1:17-CV-193, 2018 WL 1586471, at *4 (M.D.N.C. March 28, 2018) ("[W]here a customer was systematically charged more than what was contracted for and delivered . . . a North Carolina court found the practice unfair."); Respess v. Crop Prod. Servs., Inc., No. 4:15-CV-00176-BR, 2016 WL 3821163, at *4 (E.D.N.C. July 13, 2016) ("These allegations amount to a challenge to the systematic overcharging at the Bellhaven location, an act that constitutes an unfair or deceptive trade practice.").

[5] Citations and quotations to support the findings of fact are omitted in their cleaned up restatement here; however, given the Court's prior adoption and incorporation by reference of all findings of fact, those citations to the evidence remain supportive of the ultimate ruling.

85. Some items were also invoiced by Foodbuy at the incorrect amount of volume allowance; before paying, Gregory Packaging would deduct the difference between the contract price and the price invoiced

86. Foodbuy would accept those deductions but would never send a credit or revised invoice to Gregory Packaging.

87. On occasion, Foodbuy would continue billing for the products, customers, or distributors for which it had accepted a deduction.

88. The invoices sent by Foodbuy contained a "sector" instead of a customer, which is the highest level (least amount) of detail that is available to Foodbuy.

89. From those invoices, and by Foodbuy's admission, Gregory Packaging could not tell what customer was ultimately purchasing a case of juice. The customer did not appear on the invoice backup.

90. Foodbuy, however, had much more data available to it than was shared with Gregory Packing. Foodbuy receives 29 different data elements from distributors, including the price paid for each transaction. Indeed, Foodbuy receives from distributors "everything that the customer buys" with line-item detail regarding every data point available to the distributor. Such data includes: the customer billed; the billing address, city, state, zip code; each line item sold, general descriptive information about the product; and the price the customer paid.

91. In order to send an invoice with greater detail, Foodbuy must have approval from a Foodbuy Vice President. The benefit of the detail is the vendor/supplier has information "to validate the sales," a benefit Gregory Packaging did not have during the course of the Agreement.

94. Foodbuy relies on being notified by a supplier that a purchase was made through a direct deal; otherwise, Foodbuy invoices the supplier for that purchase anyway.

100. Throughout the course of the Agreement, Foodbuy was aware that Gregory Packaging had school bid business.

101. Foodbuy has nothing to do with sales made through school bids. Gregory Packaging contends it would have those sales whether it had an Agreement with Foodbuy or not.

102. Unbeknownst to Gregory Packaging, Foodbuy was charging Gregory Packaging for a volume allowance for school bid business.

103. School bid business is generally sold at a lower price than the Foodbuy price because there is no volume allowance paid on school bid sales.

120. At no time during the course of the Agreement did Foodbuy tell Gregory Packaging that it interpreted the Agreement as Foodbuy came to interpret the Agreement in this litigation—that a volume allowance is owed for all sales, whether through Foodbuy's program or not.

122. "Double-dipping" is an industry term that describes a situation in which a customer is getting the benefit of two purchasing programs. For example, double-dipping occurs when a customer purchases on a "net program," with no volume allowance such as a school bid, but draws on Foodbuy volume allowances as well.

124. A Vice President at Foodbuy, Mr. Miguel Huertas del Piño, called double-dipping a "problem," noting that the root of the problem was that "bid schools (net program)" had been subscribed to Gregory Packaging's volume allowance billing terms.

125. Once Country Pure replaced Gregory Packaging as the primary juice supplier with Foodbuy, Mr. Absaloms emphasized internally that to avoid "take backs on 'bid' like situations" and "to avoid continual problems throughout the year" Foodbuy should take care to "avoid double dipping situations."

126. Gregory Packaging first became suspicious of Foodbuy's invoices when it found that more cases were accounted for by deviations and Foodbuy invoices than were actually shipped into certain distribution centers.

127. Therefore, Gregory Packaging attempted to obtain data directly from distributors and, at first, received data from those distributors.

128. However, once this dispute was raised with Foodbuy, Gregory Packaging was unable to obtain any more data from any distributor.

130. Gregory Packaging also asked Foodbuy for detailed data regarding Foodbuy's invoices, but did not receive any detail until after the expiration of the Agreement. During the Agreement, Foodbuy refused to provide such detailed data. After the Agreement ended, Foodbuy provided more-detailed invoices covering a short period of time, which contained information regarding which customer was buying Gregory Packaging products. Even so, the detailed invoice backup did not include any pricing or cost information.

131. Therefore, Foodbuy admitted internally that "we do not have a clear delineation on bid schools and we have not been able to manage that," except for when "suppliers raise up issues or deduct on member units per invoices," but noted suppliers can only do so "if they receive unit level detail," which Gregory Packaging did not.

132. Throughout the Agreement, the parties conducted themselves as though they interpreted the Agreement the same way—that a volume allowance was only owed on cases of Suncup Juice purchased through Foodbuy's program at Foodbuy's price.

134. When Gregory Packaging came to find out about cases of juice sold through other programs that were either: (i) not a listed product; (ii) not sold by a listed Foodbuy Distributor; (iii) not sold to a listed Committed Customer; or (iv) were sold through a different program, i.e. at a different price—Foodbuy would accept a deduction or issue a credit each and every time.

135. When Gregory Packaging was invoiced for customers that were "double-dipping," Foodbuy agreed Gregory Packaging should not be invoiced for that customer and assured Gregory Packaging that Foodbuy would "scrub" its data going back years to ascertain and correct instances of Gregory Packaging being invoiced by Foodbuy when a Committed Customer was receiving the benefit of another program.

138. When Gregory Packaging refused to pay volume allowances on that same customer, IPS, because IPS was using "bid pricing," the Vice President of Category Development at Foodbuy said "[i]f after our investigation we discover Gregory Packaging is right then (i) we will need to collect back any VA that we may need to repay back from IPS/Dining alliance, (ii) we will need to exclude IPS from the Gregory term-set so we don't continue billing," This evidence shows that Foodbuy contemplated that a volume allowance was not owed if IPS was purchasing through school bids.

139. In January of 2014, a procurement analyst at Foodbuy asked Gregory Packaging's Vice President of Sales to mark on a list of products what products were eligible for the Foodbuy program and which were not eligible for the Foodbuy program. The only reason for Foodbuy to have any interest in the identification of what was eligible for its program is that Foodbuy understood it was not permitted to invoice for a volume allowance on all purchases, but instead it could invoice only those purchased through its program.

140. Even Foodbuy called it "overbilling" when it admitted to "overbilling" for three Committed Customers and two distributors because they had school bid business. Foodbuy appeared to acknowledge then, even after the Agreement ended that billing for school bid business was "overbilling."

141. Additionally, Foodbuy determined which customers were purchasing through Foodbuy and which were purchasing through other programs, such as school bids, by comparing pricing. This is probative of the fact that those purchasing at other prices are buying "off-contract"; are not owed a volume allowance; and Foodbuy agreed with that during the course of the Agreement and after, until this litigation commenced.

10

142. Foodbuy never stated to Gregory Packaging—at any time during the Agreement—that its interpretation was as it interprets the Agreement now—that [it] was entitled to a volume allowance for every case of juice sold by any entity to any entity at any price. Yet, Foodbuy had numerous opportunities to do so.

143. If Foodbuy had been operating at that time under its current interpretation, Foodbuy could have told Gregory Packaging of that interpretation and would have refused to allow Gregory Packaging to deduct amounts when "off-contract" sales were found and brought to Foodbuy's attention.

144. To the contrary, when a Foodbuy employee wrote that interpretation in a draft email to Gregory Packaging—months after the expiration of the Agreement—it was removed internally before the message was sent to Gregory Packaging.

These findings of fact and the evidence supporting them establish that Foodbuy attempted to conceal its breach, deterred further investigation by GPI, employed deceptive practices for the purpose of continuing to receive the benefits of the Agreement, and engaged in systemically overcharging more than the Agreement allows. This Court and the Fourth Circuit have already ruled that Foodbuy had a reasonable basis for its interpretation of the Agreement;[6] albeit this Court ruled Foodbuy's interpretation to be wrong.[7] Notwithstanding its interpretation of the Agreement, Foodbuy's conduct reflects that it concealed the basis for its pricing (along with its interpretation of the Agreement), deceived GPI into believing Foodbuy agreed with GPI's pricing, deterred GPI's efforts to investigate the data supporting Foodbuy's pricing, and continued to overbill GPI despite representations otherwise. Collectively, these facts demonstrate more than a "mere breach of contract" and instead demonstrate aggravating and egregious circumstances attending the breach.[8]

---

[6] "[W]e find the Agreement to be ambiguous. Based on the Agreement's plain language, there is ample support for both GPI's and Foodbuy's constructions." Foodbuy, 987 F.3d at 120.
[7] See Trial Order, (Doc. No. 85).
[8] See D.G. II, LLC v. Nix, 713 S.E.2d 140, 148–49 (N.C. Ct. App. 2011) (recognizing that a combination of factors attending a breach of contract can constitute "aggravating circumstances" necessary to sustain an UDTPA claim against the defendant (citing Poor v. Hill, 530 S.E.2d 838, 845 (N.C. Ct. App. 2000))).

11

The concealment of a breach, *i.e.*, the overbilling, is apparent here because Foodbuy never communicated that it interpreted the Agreement differently than GPI throughout the bulk of the parties' business together, and the evidence shows Foodbuy continued to overbill notwithstanding GPI's objections and Foodbuy's subsequent representations that it would adjust invoices. When GPI confronted Foodbuy to adjust pricing (based on GPI's interpretation of the Agreement)—whether that be Foodbuy charging a volume allowance for (i) unauthorized products; (ii) unauthorized Foodbuy Distributors; (iii) unauthorized customers; or (iv) cases sold through a different program—Foodbuy would accept a deduction or issue a credit *each and every time*. Additionally, Foodbuy provided GPI assurances that Foodbuy would "scrub" its data and correct any instances overbilling. Even Foodbuy's internal communications reflect some intent to "avoid double dipping," efforts to "please look at . . . bid business," and an acknowledgement an "investigation;" however, nothing indicates Foodbuy changed its invoicing or billing practices with GPI. Had Foodbuy interpreted the Agreement in a way to support its billing, it could have asserted such interpretation at any point after GPI raised objections to an invoice. In other words, instead of asserting a difference in the parties' Agreement, Foodbuy responded favorably to GPI's position and represented to GPI that it would investigate invoices and adjust them accordingly. By representing that it agreed with GPI's pricing calculations in these instances, Foodbuy actively sought to conceal its breach and continue to receive the benefits of the Agreement. The fact Foodbuy would issue a credit or allow a deduction—at least until litigation was on the horizon and Foodbuy communicated its interpretation of the Agreement—does not shield this conduct. These representations proved to mislead and deceive GPI here, particularly where Foodbuy continued its systematic overbilling and deterred GPI's investigation into any breach of the Agreement.

Despite the reliance on GPI to identify overbilling,[9] Foodbuy refused to provide GPI sufficient resources and deterred GPI's investigation into details surrounding Foodbuy invoices. It is undisputed that Foodbuy's invoices failed to provide sufficient detail to allow GPI to know which customer purchased the product or the applicable purchase price. When GPI requested data to support invoices, Foodbuy refused to disclose the data.[10] In addition, although some distributors initially provided data to GPI when requested, the distributors ceased providing that information once the dispute with Foodbuy arose. While the Court cannot conclude the evidence establishes Foodbuy instructed distributors to withhold this information, it remains undisputed that Foodbuy also did not supply this or other sufficient pricing data for GPI to use in investigating the overbilling. But see Foodbuy, 987 F.3d at 111 ("At that point, GPI tried to obtain the relevant data directly from distributors. Once Foodbuy learned about the dispute, however, *it prevented GPI from doing so.*" (emphasis added)).

In sum, Foodbuy's continued overbilling despite representations to the contrary, coupled with the reliance on GPI to identify the overbilling and Foodbuy's subsequent refusal to provide sufficient data for GPI to do so, extends beyond a "mere breach of contract" and constitutes an unfair and deceptive trade practice.

The Court's inquiry does not end there because GPI must still prove damages proximately caused by Foodbuy's unfair and deceptive trade practice.

> Under N.C. Gen. Stat. § 75-16, courts must treble damages if a defendant violates the UDTPA. In Gray v. North Carolina Insurance Underwriting Ass'n, the Supreme

---

[9] The Court notes Foodbuy's reliance on GPI to detect overbilling was not unique. The trial evidence demonstrated that Foodbuy had a pattern of correcting invoices because of "ineligibility/direct deals" only after the issue was "manufacturer disclosed." (Trial Order, Findings of Fact # 80-82).

[10] For example, Foodbuy acknowledged that it could not manage a delineation for the school bid business, instead relying on GPI to raise issues based on "unit level detail." However, Foodbuy refused to provide this type of "unit level" data when GPI sought to investigate the overcharging.

13

Court of North Carolina explained that a trebled award is limited to "damages proximately caused by a [UDTPA] violation," not "damages on every claim that happens to arise in a case involving a [UDTPA] violation." 529 S.E.2d at 684–85. "To recover treble damages, a plaintiff must show that he suffered actual injury as a proximate result of [a] defendant's deceptive statement or misrepresentation." Id. at 685 (cleaned up).

DENC, 32 F.4th at 52. Here, the evidence shows Foodbuy's aggravating and egregious circumstances proximately caused GPI's injuries. Had Foodbuy simply refused to permit the deduction whenever GPI presented the overbilling early in the parties' dealings, then Foodbuy still would have breached the contract (based on this Court's interpretation of the Agreement), but there would be no aggravating circumstance. In other words, GPI would have the right to bring a claim against Foodbuy for simple breach of contract—no aggravating circumstance would be present. Instead, Foodbuy concealed its breach, deceived GPI that it agreed with GPI's interpretation of pricing under the Agreement, and deterred investigation so that GPI continued to believe Foodbuy was charging only for authorized sales through the Foodbuy program. This conduct proximately caused the damages suffered by GPI.

Accordingly, GPI is entitled to judgment of treble damages on its claim for Unfair and Deceptive Trade Practices.

## IV. CONCLUSION

The Court therefore ORDERS, JUDGES, and DECREES:

1. That judgment on GPI's counterclaim brought pursuant to N.C. Gen. Stat. § 75-1.1, the North Carolina Unfair and Deceptive Trade Practices Act, be entered in favor of Gregory Packaging, Inc.;

2. That the compensatory damages found by the Court, totaling $7,057,882.52, be trebled,[11] for a total judgment in this matter of $21,173,647.56;[12] however, because the original judgment in this case has been satisfied, (Doc. No. 114), the remaining judgment owed by Foodbuy is $14,115,765.04;

3. That post-judgment interest be awarded pursuant to 28 U.S.C. § 1961(a) from the date of this Order and Judgment until the judgment is satisfied.[13]

IT IS SO ORDERED.

Signed: August 3, 2022

_____
Frank D. Whitney
United States District Judge

---

[11] The Court's Original Order and Judgment included prejudgment interest in addition to compensatory damages; however, the North Carolina Court of Appeals has held that "a pre-judgment interest award should not attach to the trebled damages, but only to the actual damages awarded for the breach of contract that was found to be an unfair trade practice." Johnson v. Colonial Life & Acc. Ins. Co., 618 S.E.2d 867, 872 (N.C. Ct. App. 2005) (citation omitted).

[12] Once the Court finds an unfair or deceptive act, the trebling of compensatory damages is automatic. Pearce v. Amer. Def. of Life Ins. Co., 343 S.E.2d 174 (N.C. 1986) (noting the UDTPA mandates the automatic assessment of treble damages once a violation is shown); Clark Material Handling Co. v. Toyota Material Handling U.S.A., Inc., No. 3:12-CV-00510-MOC, 2015 WL 3514339, at *4 (W.D.N.C. June 4, 2015) ("[I]f unfair methods of competition or unfair or deceptive acts or practices in or affecting commerce under G.S. 75–1.1 are found, the court must treble the damages awarded. In light of the court's analysis, a treble award of the UDTPA verdict amount is required.") (internal citations omitted).

[13] "The award of post-judgment interest applies to the entire trebled amount awarded under a UDTPA claim." Clark Material Handling Co., No. 3:12-CV-00510-MOC, 2015 WL 3514339, at *10 (W.D.N.C. June 4, 2015); Volumetrics Med. Imaging, Inc. v. ATL Ultrasound, Inc., No. 1:10-CV-182, 2003 WL 21650004 (M.D.N.C. July 10, 2003) ("Plaintiff will further be awarded postjudgment interest on the entire trebled $318.75 million figure.").

15